LATHAM & WATKINS LLP
    Christopher S. Yates (Cal. Bar No. 161273)
    *chris.yates@lw.com*
    Belinda S Lee (Cal. Bar No. 199635)
    *belinda.lee@lw.com*
    Aaron T. Chiu (Cal. Bar No. 287788)
    *aaron.chiu@lw.com*
505 Montgomery Street, Suite 2000
San Francisco, California 94111-6538
Telephone: +1.415.391.0600

LATHAM & WATKINS LLP
    Sean M. Berkowitz (*pro hac vice*)
    *sean.berkowitz@lw.com*
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone: +1.312.876.7700

*Attorneys for Defendants Broadcom Inc., Broadcom Corporation and Avago Technologies International Sales Pte. Limited*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SAMSUNG ELECTRONICS CO., LTD.,<br><br>Plaintiff,<br><br>v.<br><br>BROADCOM INC., BROADCOM CORPORATION, AND AVAGO TECHNOLOGIES INTERNATIONAL SALES PTE. LIMITED,<br><br>Defendants. | CASE NO. 3:24-cv-03959-LB<br><br>**DEFENDANTS' NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS**<br><br>Date:      December 5, 2024<br>Time:      9:30 a.m.<br>Courtroom:  Courtroom B, 15th Floor<br>Before:    Hon. Laurel Beeler |

**REDACTED VERSION**

<u>**NOTICE OF MOTION AND MOTION**</u>

TO THIS HONORABLE COURT, THE PARTIES, AND THEIR ATTORNEYS OF RECORD, PLEASE TAKE NOTICE THAT on December 5, 2024 at 9:30 a.m. at the courtroom of the Judge Laurel Beeler, Courtroom B, 15th Floor of the United States District Court for the Northern District of California, San Francisco Division, located at 450 Golden Gate Ave., San Francisco, California, Defendants Broadcom Inc., Broadcom Corporation, and Avago Technologies International Sales Pte. Limited ("Defendants" or "Broadcom") will and hereby do move the Court to dismiss with prejudice all claims brought by Plaintiff Samsung Electronics Co. Ltd. ("Samsung"), pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

Dated:  August 28, 2024                    LATHAM & WATKINS LLP

By:  */s/ Christopher S. Yates*
            Christopher S. Yates

Christopher S. Yates (Cal. Bar No. 161273)
*chris.yates@lw.com*
Belinda S Lee (Cal. Bar No. 199635)
*belinda.lee@lw.com*
Aaron T. Chiu (Cal. Bar No. 287788)
*aaron.chiu@lw.com*
505 Montgomery Street, Suite 2000
San Francisco, California 94111-6538
Telephone: +1.415.391.0600
Fax: +1.415.395.8095

Sean M. Berkowitz (*pro hac vice*)
*sean.berkowitz@lw.com*
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone: +1.312.876.7700
Fax: +1.312.993.9767

*Attorneys for Defendants Broadcom Inc.,*
*Broadcom Corporation and Avago Technologies*
*International Sales Pte. Limited*

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION .................................................................................................................. 1

II.   STATEMENT OF ISSUES TO BE DECIDED ................................................................. 2

III.  BACKGROUND & SUMMARY OF RELEVANT ALLEGATIONS............................ 3

      A.    Samsung Electronics Co., Ltd.................................................................................. 3

      B.    Broadcom Inc., Broadcom Corp. and Avago Technologies
            International Sales Pte. Limited............................................................................... 3

      C.    Investment and Co-Development of the Critical Components ............................ 4

      D.    The Strategic Agreement ......................................................................................... 5

      E.    Notwithstanding the Six-Month Duration of the Strategic
            Agreement, Samsung Was Able to "Multi-Source" Components
            and Secure Alternate Suppliers at Its Preferred Prices ...................................... 7

      F.    Samsung's Claims..................................................................................................... 7

IV.   LEGAL STANDARD........................................................................................................ 10

V.    ARGUMENT ..................................................................................................................... 10

      A.    Samsung's Claims Are Time-Barred ................................................................... 10

            1.    All Alleged Conduct, Including the Execution of the
                  Strategic Agreement, Occurred Outside the Four-Year
                  Statute of Limitations................................................................................. 10

            2.    Samsung Cannot Plead a Continuing Violation Sufficient to
                  Restart the Antitrust Statute of Limitations ............................................ 11

      B.    Samsung Fails to Plead Any Injury to Itself or Competition............................. 13

            1.    Samsung Suffered No Injury-In-Fact and Lacks Article III
                  Standing ....................................................................................................... 13

            2.    Samsung Fails to Plead the Requisite Harm to Competition.................. 15

      C.    Samsung's Exclusive Dealing Claims Fail .......................................................... 18

            1.    The Strategic Agreement, Which Did Not Require
                  Exclusivity and Remained in Effect for Only Six Months,
                  Cannot Be Exclusive as a Matter of Law................................................. 18

            2.    Samsung's Alleged Foreclosure Shares are Premised on
                  Implausible, Gerrymandered Markets ...................................................... 20

      D.    Samsung's Tying Claims Fail................................................................................ 22

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
SAN FRANCISCO

iii

MOTION TO DISMISS
CASE NO. 3:24-CV-03959-LB

1.    There Is No Unlawful Tie Because the Strategic Agreement Did Not Condition the Sale of Phone Standalone BT/Wi-Fi Chips or the Sale of GNSS/GPS Chips on the Purchase of OMH LPAMiD Modules ...................................................................... 23

2.    Samsung's Alleged Tying Product Market Fails ..................................... 24

E.    Samsung's Monopolization Claims Fail ........................................................... 24

1.    Samsung Fails to Plead Any Anticompetitive Conduct to Sustain a Monopolization Claim ................................................................ 24

2.    Samsung's Monopolization Claims Are Premised on an Implausible "Phone Standalone BT/Wi-Fi Chip Market" ...................... 25

F.    Samsung's Cartwright Act Exclusive Dealing and Tying Claims Fail ............................................................................................................... 25

VI.    CONCLUSION ................................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP*,
   592 F.3d 991 (9th Cir. 2010) .................................................................................... 18

*AMF, Inc. v. General Motors Corp.* (*In re Multidistrict Vehicle Air Pollution*),
   591 F.2d 68 (9th Cir. 1979) ........................................................................... 12, 13

*Apple Inc. v. Psystar Corp.*,
   586 F. Supp. 2d 1190 (N.D. Cal. 2008) ................................................................. 22

*Arcell v. Google LLC*,
   No. 5:22-cv-02499-EJD, 2023 WL 5336865 (N.D. Cal. Aug. 18, 2023) ........................... 14

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................................. 10

*Bakay v. Apple Inc.*,
   No. 24-cv-00476-RS, 2024 WL 3381034 (N.D. Cal. July 11, 2024) ........................... 15, 18

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................................. 10

*Cascade Health Solutions v. PeaceHealth*,
   515 F.3d 883 (9th Cir. 2008) ................................................................................. 22

*Coalition for ICANN Transparency, Inc. v. Verisign, Inc.*,
   611 F.3d 495 (9th Cir. 2010) ................................................................................. 10

*County of Tuolumne v. Sonora Community Hospital*,
   236 F.3d 1148 (9th Cir. 2001) ............................................................................... 25

*Dreamstime.com v. Google LLC*,
   54 F.4th 1130 (9th Cir. 2022) ............................................................................... 25

*Eastern Food Services, Inc. v. Pontifical Catholic University Services
   Association, Inc.*,
   357 F.3d 1 (1st Cir. 2004) ..................................................................................... 18

*Eichmann v. Fotomat Corp.*,
   880 F.2d 149 (9th Cir. 1989) ........................................................................... 12, 13

*Electroglas, Inc. v. Dynatex Corp.*,
   497 F. Supp. 97 (N.D. Cal. 1980) .......................................................................... 13

*Federal Trade Commission v. Motion Picture Advertising Service Co.*,
   344 U.S. 392 (1953) ............................................................................................. 20

*Federal Trade Commission v. Qualcomm Inc.*,
   969 F.3d 974 (9th Cir. 2020) ....................................................................... 18, 19, 24

*Feitelson v. Google Inc.*,
    80 F. Supp. 3d 1019 (N.D. Cal. 2015) ............................................................... 15, 18

*Garrison v. Oracle Corp.*,
    159 F. Supp. 3d 1044 (N.D. Cal. 2016) ................................................................... 12

*Gerlinger v. Amazon.com, Inc.*,
    526 F.3d 1253 (9th Cir. 2008) ................................................................................. 13

*Glen Holly Entertainment, Inc. v. Tektronix Inc.*,
    343 F.3d 1000 (9th Cir. 2003) ................................................................................. 15

*Global Tel*Link Corp. v. JACS Solutions Inc.*,
    No. 1:23-cv-179, 2023 WL 8918281 (E.D. Va. Dec. 27, 2023)............................... 17

*Hicks v. PGA Tour, Inc.*,
    897 F.3d 1109 (9th Cir. 2018) ................................................................................. 22

*Huynh v. Chase Manhattan Bank*,
    465 F.3d 992 (9th Cir. 2006) ................................................................................... 11

*In re Animation Workers Antitrust Litigation*,
    87 F. Supp. 3d 1195 (N.D. Cal. 2015) ..................................................................... 11

*In re ATM Fee Antitrust Litigation*,
    768 F. Supp. 2d 984 (N.D. Cal. 2009) ..................................................................... 21

*In re Capacitors Antitrust Litigation*,
    106 F. Supp. 3d 1051 (N.D. Cal. 2015) ..................................................................... 8

*In re German Automotive Manufacturers Antitrust Litigation*,
    392 F. Supp. 3d 1059 (N.D. Cal. 2019) ..................................................................... 8

*In re Gilead Sciences Securities Litigation*,
    536 F.3d 1049 (9th Cir. 2008) ................................................................................. 10

*In re Super Premium Ice Cream Distributors Antitrust Litigation*,
    691 F. Supp. 1262 (N.D.Cal. 1988) ......................................................................... 21

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.*,
    304 F.3d 829 (9th Cir. 2002) ................................................................................... 11

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
    232 F.3d 979 (9th Cir. 2000) ................................................................................... 15

*Lucas Automotive Engineering., Inc. v. Bridgestone/Firestone, Inc.*,
    140 F.3d 1228 (9th Cir. 1998) ................................................................................. 13

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)................................................................................................. 13

*Ice Cream Distributors of Evansville, LLC*,
    No. 09-5815 CW, 2010 WL 2198200 (N.D. Cal. May 28, 2010) ............................ 25

*Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*,
   795 F.3d 1124 (9th Cir. 2015) ........................................................................... 25

*Newcal Industries v. Ikon Office Solution*,
   513 F.3d 1038 (9th Cir. 2008) ..................................................................... 22, 24

*Omega Environmental, Inc. v. Gilbarco, Inc.*,
   127 F.3d 1157 (9th Cir. 1997) ............................................................. 18, 20, 21

*Oracle America, Inc. v. Cedarcrestone, Inc.*,
   938 F. Supp. 2d 895 (N.D. Cal. 2013) .............................................................. 22

*Pace Industries, Inc. v. Three Phoenix Co.*,
   813 F.2d 234 (9th Cir. 1987) ........................................................................... 11

*Pacific Steel Group v. Commercial Metals Co.*,
   No. 20-cv-07683-HSG, 2024 WL 3236705 (N.D. Cal. June 28, 2024) ............... 18

*Paddock Publications, Inc. v. Chicago Tribune Co.*,
   103 F.3d 42 (7th Cir. 1996) ............................................................................. 20

*Pistacchio v. Apple Inc.*,
   No. 4:20-cv-07034-YGR, 2021 WL 949422 (N.D. Cal. Mar. 11, 2021) ............. 14

*PNY Technologies, Inc. v. SanDisk*,
   No. 11-cv-4689-WHO, 2014 WL 1677521 (N.D. Cal. 2014) ...................... *passim*

*ProSearch Plus, LLC v. VFM Leonardo, Inc.*,
   No. SACV 12-2102-JST (ANx), 2013 WL 3936394 (C.D. Cal. July 30, 2013) ................. 25

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
   124 F.3d 430 (3d Cir. 1997) ............................................................................ 22

*Reilly v. Apple Inc.*,
   578 F. Supp. 3d 1098 (N.D. Cal. 2022) ...................................................... 21, 24

*Rick-Mik Enterprises, Inc. v. Equilon Enterprises LLC*,
   532 F.3d 963 (9th Cir. 2008) ........................................................................... 24

*Roland Machinery Co. v. Dresser Industries, Inc.*,
   749 F.2d 380 (7th Cir. 1984) ........................................................................... 20

*Samsung Electronics Co., Ltd. v. Panasonic Corp.*,
   747 F.3d 1199 (9th Cir. 2014) ............................................................... 11, 12, 13

*Stewart v. Gogo, Inc.*,
   No. C–12–5164 EMC, 2013 WL 1501484 (N.D. Cal. Apr. 10, 2013) ................ 25

*Streamcast Networks, Inc. v. Skype Technologies, S.A.*,
   547 F. Supp. 2d 1086 (C.D. Cal. 2007) ...................................................... 21, 24

*Tanaka v. University of Southern California*,
   252 F.3d 1059 (9th Cir. 2001) ......................................................................... 25

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

vii

MOTION TO DISMISS
CASE NO. 3:24-CV-03959-LB

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) .......................................................................................... 2

*Thurman Industries v. Pay 'N Pak Stores, Inc.*,
    875 F.2d 1369 (9th Cir. 1989) ...................................................................... 21

*Z Technologies Corp. v. Lubrizol Corp.*,
    753 F.3d 594 (6th Cir. 2014) ................................................................. 12, 13

### STATUTES

15 U.S.C. § 1 .......................................................................................................... 3, 9

15 U.S.C. § 14 ........................................................................................................ 3, 9

15 U.S.C. § 2 .......................................................................................................... 3, 9

Cal. Bus. & Prof. Code § 16720 ............................................................................. 10

Cal. Bus. & Prof. Code § 16727 ............................................................................. 10

## I.     INTRODUCTION

In March of 2020, Samsung and Broadcom signed an agreement (the "Strategic Agreement") under which Broadcom would invest many tens of millions of dollars to develop specialized components for use in Samsung smartphones.[1]  In exchange, Samsung committed to buy ████████████████████ of Broadcom products (both the specialized chips and other components).  The Strategic Agreement was the product of negotiations between two sophisticated companies:  Samsung (with annual revenues of over $200 billion in 2020) and Broadcom (at about one-tenth of Samsung's size with annual revenues of $23.8 billion in 2020).

The age of the Strategic Agreement leads to the threshold problem that Samsung's Complaint (filed on July 1, 2024) is time-barred.  All of the alleged conduct, including the execution of the Strategic Agreement, occurred outside the four-year statute of limitations governing Samsung's federal and California state antitrust claims.  Samsung's claims can and should be dismissed on this basis alone.

But the merits of Samsung's antitrust claims fare no better.  Samsung's Complaint is rife with conclusory allegations of exclusive dealing, but Samsung makes four key admissions that undermine its claims:

1.     As early as 2019, before the Strategic Agreement, "nascent competition to Broadcom" emerged that "enabled Samsung to begin to implement its long-standing preference for multi-sourcing" for Bluetooth/Wi-Fi and GNSS/GPS chips, and OMH LPAMiD components—which Samsung collectively refers to as the "Critical Components."  Compl. ¶¶ 2, 59.  Samsung was able to source components from another supplier (Qorvo) *seven months before* the Strategic Agreement's execution.  *Id.* ¶¶ 5, 59–60.

2.     Contrary to its claim of exclusive dealing, Samsung could—and did—buy these "Critical Components" from other suppliers.  Throughout the Strategic Agreement, Samsung admittedly "used OMH LPAMiD chips from both Broadcom and Qorvo."  *Id.* ¶ 54.

3.     Since terminating the agreement, Samsung "has begun sourcing BT/Wi-Fi chips

---

[1] Throughout this motion "Broadcom" refers collectively to Defendants Broadcom Corp. and Avago Technologies International Sales Pte., Ltd.  While Broadcom Inc. is also named as a defendant, Broadcom Inc. is not a party to the Strategic Agreement.

from Qualcomm" (*id.* ¶ 45).   Samsung's ability to obtain alternate sourcing following the termination of the Strategic Agreement confirms it did not foreclose competition.

4.      The Strategic Agreement was executed on March 27, 2020 and was in effect for just six months:  from January 1, 2021 until the parties mutually agreed to terminate it effective July 2, 2021.  *Id.* ¶¶ 76, 90.  This six-month duration is too short to support an unlawful exclusive dealing claim as a matter of law.  Courts universally hold that allegedly exclusive contracts with a duration of one year or less are not unlawful.  The circumstances here, as reflected in Samsung's Complaint, confirm why:  notwithstanding the Strategic Agreement, no competing component suppliers were actually foreclosed from the market, and consequently Samsung was not hampered in securing alternative supply for the "Critical Components" for its smartphones and other products.  This dooms Samsung's claims because the cornerstone of any actionable exclusive dealing case is that the terms of exclusivity, "de facto" or otherwise, actually harm competition.

As for Samsung's tying claims, the Strategic Agreement by its terms does not condition the sale of any components on the purchase of Broadcom's Bluetooth/Wi-Fi or GNSS/GPS chips, meaning that there is no tie.[2]  The failure to plead any unlawful exclusive dealing or tying dooms Samsung's monopolization claims too.  And Samsung's inability to allege anticompetitive conduct under the Sherman Act is fatal to its state law claims, which mirror their federal counterparts.

Samsung's Complaint works hard trying to turn the mutual termination of a more than four-year old commercial contract into an antitrust case.  But, since Samsung's own allegations confirm it cannot plead what is required to state exclusive dealing, tying and monopolization claims, its Complaint should be dismissed with prejudice.

## II.      STATEMENT OF ISSUES TO BE DECIDED

1.      Whether Samsung's claims, premised on a contract executed in March 2020, are time-barred under the four-year statutes of limitations governing federal and state antitrust claims?

---

[2] When resolving a motion to dismiss, a court "must consider the complaint in its entirety, as well as other sources courts ordinarily examine . . . , in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  It is indisputable that the Complaint incorporates by reference the Strategic Agreement and the Termination Agreement, attached as **Exhibits 1** and **2** to the Declaration of Aaron T. Chiu.

2.      Whether Samsung's exclusive dealing claim under Section 3 of the Clayton Act, 15 U.S.C. § 14, and Section 1 of the Sherman Act, 15 U.S.C. § 1, should be dismissed given that (a) the Strategic Agreement was in effect for only six months, and (b) Samsung admits that notwithstanding the contract, it was at all times able to secure alternative sources of supply for its desired components, confirming that the contract did not harm competition?

3.      Whether Samsung's tying claim under Section 1 of the Sherman Act, 15 U.S.C. § 1, should be dismissed given that the Strategic Agreement does not condition the sale of any Broadcom components upon the purchase of any other Broadcom products?

4.      Whether Samsung's monopolization and attempted monopolization claims under Section 2 of the Sherman Act, 15 U.S.C. § 2, should be dismissed as those claims rest on Samsung's implausibly alleged exclusive dealing and tying claims?

5.      Whether Samsung's California Cartwright Act claims should be dismissed as those claims rest on Samsung's implausible exclusive dealing and tying claims under federal law?

## III.     BACKGROUND & SUMMARY OF RELEVANT ALLEGATIONS

### A.      Samsung Electronics Co., Ltd.

Samsung is a multinational electronics company and one of the world's largest manufacturers of consumer electronics and industrial electronic equipment and products.  Compl. ¶ 17.  Samsung manufactures and sells personal electronics, such as smartphones, televisions, tablets, and wearable smartwatches, products that are used by millions of consumers and businesses globally.  *Id.* ¶¶ 1, 17.  In 2020, Samsung's annual revenues topped $200 billion.

According to Samsung, it faces significant competition from Apple, Google, HTC, and other smartphone manufacturers.  *Id.* ¶ 25.  Samsung's strategy is to sell high-end products like the Galaxy S & Note series based on leading-edge and first-of-their-kind technology.  *Id.* ¶¶ 24–25. Samsung partners with developers and manufacturers, like Broadcom, to develop sophisticated, leading technology that meet Samsung's innovative design needs.  *Id.* ¶¶ 2, 24, 71.

### B.      Broadcom Inc., Broadcom Corp. and Avago Technologies International Sales Pte. Limited

Broadcom Inc. develops and manufactures semiconductor components for electronic

1   products.  *Id*. ¶ 18.  Broadcom's business in the smartphone industry focuses on supplying high-

2   specification components to customers that require customized components for their respective

3   designs, which enable these customers to offer best-in-class, innovative products.  *Id*. ¶¶  24, 71.

4   Co-defendants Broadcom Corporation and Avago Technologies International Sales Pte. Limited

5   are subsidiaries of Broadcom Inc. that manufacture semiconductor components.  *Id*. ¶¶ 19–20.

6       Over the years, given Samsung's sustained need for cutting edge components, Broadcom

7   continuously developed new technologies and processes for delivering components suited to

8   Samsung's go-to-market strategies.  *Id*. ¶¶ 24, 71.  Broadcom even went so far to build a

9   specialized development team focused on meeting Samsung's requirements.  *See id*. ¶ 71.

10      **C.      Investment and Co-Development of the Critical Components**

11      Developing high-quality components for smartphones requires years of research and

12  development and millions of dollars of investments.  *Id*. ¶ 46.  These components are highly

13  customized to meet the specific smartphone manufacturer's needs, given the performance aspects

14  and other key features that they hope to achieve with their end product.  *Id*. ¶ 71 ("The Critical

15  Components from Broadcom are custom designed for Samsung's devices . . . Samsung and

16  Broadcom would exchange e-mails and calls daily, and in certain cases, hold weekly meetings,

17  discussing software improvement efforts and Samsung's development projects related to

18  Broadcom's chips.").  Samsung manufactures some of the most popular smartphones in the world,

19  constantly seeking to improve its devices' performance in an effort to outperform the competition.

20  *See id*. ¶ 1.  As the Complaint acknowledges, there are multiple participants in the semiconductor

21  industry capable of producing these components.   Over the years, Broadcom has partnered with

22  Samsung in its endeavor to consistently push the boundaries of smartphone components, working

23  with Samsung to design components, and offering technical support to ensure integration to

24  provide the best go-to-market product possible.  *Id.* ¶ 4, 24, 71.

25      Broadcom invested hundreds of millions of dollars into this partnership.  As Samsung

26  acknowledges, it cannot quickly reconfigure its devices to fit other components.  *Id*. ¶ 35.  Samsung

27  also cannot make use of components that are technologically inadequate or that lack the size, power

28  draw, and other performance characteristics that Samsung's smartphones require.  *Id*. ¶¶ 32, 53.

1  Nor can Broadcom easily resell components built and co-developed for Samsung's products.

2  Broadcom would incur significant losses on the investments it dedicated to serving Samsung's

3  needs if Samsung did not source enough of the components Broadcom developed for Samsung.

4      In light of this, requiring certain volume commitments is common in the industry, and

5  required to make it worthwhile for manufacturers to undertake the significant investments to

6  co-develop and engineer components customized for a customer's devices.  That is reflected in the

7  Strategic Agreement (incorporated by reference and attached hereto as **Exhibit 1**), to which

8  Samsung voluntarily agreed to ████████████████████████████████████████

9  ████████████████████████████████████ . *See* Ex. 1 §§ B, C.

10      **D.  The Strategic Agreement**

11      Samsung sought out Broadcom's products and services for decades.  Compl. ¶¶ 4, 58.  For

12  years, Broadcom invested in developing technology to help Samsung produce cutting edge

13  consumer products.  During that time, Samsung and Broadcom entered into multiple memoranda

14  of understanding for Broadcom to supply components to Samsung.  Leading up to 2019, due to

15  lesser demand for its products, Samsung had begun canceling orders notwithstanding these MOUs

16  and Broadcom's significant investments in developing components for Samsung.  Broadcom

17  accordingly sought to enter into a Strategic Agreement that would commit Samsung to continue

18  purchasing enough to make Broadcom's ongoing investments economically viable.  Samsung and

19  Broadcom negotiated the Strategic Agreement at arms-length, reaching terms that justified

20  Broadcom's investment while mutually benefiting Samsung by providing the assurances that its

21  needs would be met by Broadcom as they arose.

22      The Strategic Agreement was executed on March 27, 2020, with an effective date of

23  January 1, 2021.  Ex. 1 § A; *id.* at 6.  It was entered into for the purpose of "████████

24  ████████████████████████████████████████████████████████████████

25  ████████████████████████████████████████ *Id.* at 1.  It provided for

26  a ████████ . *Id.* § A.

27      The Strategic Agreement provided for the supply of "████████████" by Broadcom,

28  defined to ████████████████████████████████████████████████████████

1     ██████████████████████████████ *Id.* In exchange,

2 Samsung agreed to an █████████████████████████████████████

3 █████████████████. *Id.* § B. ██████████████, and as Samsung acknowledges

4 (Compl. ¶ 77), the agreement is not exclusive.  Rather, it merely requires ████████

5 ██████████████████████████ Ex. 1 § B.

6       The terms of the Strategic Agreement are also not coercive.  As Samsung admits, nothing

7 in the Strategic Agreement conditions Broadcom's sale of Phone Standalone OMH LPAMiD chips

8 on Samsung's purchase of BT/Wi-Fi or GNSS/GPS chips.  Rather, the Strategic Agreement ██████

9 ████████████████████████████████████████████████

10 ████████████████████████████████████████████████

11 ████████████████████████ *Id.* § C(6).

12       The Strategic Agreement also included numerous favorable terms for Samsung, including:

13      •   A term providing that ███████████████████████

14 ██████████████████████████████████████████ (*Id.* § F.

15 ████████████████████

16      •   █████████████████████████████████ (*id.* § C(3)).

17

18      •   ██████████████ (*id.* § C(5)).████████████████████

19 █████████████████████████████████████████.

20      •   An agreement to ████████████████████████████

21 ██████████████████████████████ (*Id.* § C(6)).

22      •   ████████████ (*Id.* § C(7)).

23      •   ███████████ (*id.* § E).

24       Ultimately, notwithstanding the Strategic Agreement's ████████ term, the parties

25 mutually agreed to terminate the agreement, effective July 2, 2021.  Compl. ¶ 90; *see also* Ex. 2.

26 Therefore, the Strategic Agreement was in effect for just *six* months.  The parties subsequently

27 walked away.  To date, Broadcom has not enforced the Strategic Agreement's terms to collect on

28 the remaining balance due for the six months that the Strategic Agreement was in effect.

**E.     Notwithstanding the Six-Month Duration of the Strategic Agreement, Samsung Was Able to "Multi-Source" Components and Secure Alternate Suppliers at Its Preferred Prices**

Samsung does not and cannot allege that at any time before, during, or after the six-month duration of the Strategic Agreement, it was precluded from negotiating or obtaining alternate supply for any of the "Critical Components" allegedly covered by the Strategic Agreement.  In fact, Samsung alleges that before the Strategic Agreement, "nascent competition to Broadcom" emerged in 2019 and "enabled Samsung to begin to implement its long-standing preference for multi-sourcing."  Compl. ¶ 59.  Samsung began sourcing "Critical Components from Broadcom's competitors," including OMH components from Qorvo in August 2019—*seven months* before the Strategic Agreement's execution.  *Id.* ¶¶ 5, 59–60.  And Samsung "used OMH LPAMiD chips from both Broadcom and Qorvo in its Flagship Devices in the United States."  *Id.* ¶ 54.

Critically, following termination of the Strategic Agreement at Samsung's request, Samsung began "sourcing BT/Wi-Fi chips from Qualcomm."  *Id.* ¶ 45.  Indeed, "Qualcomm has recently launched a phone standalone BT/Wi-Fi chip in competition with Broadcom."  *Id.* Samsung does not make any non-conclusory, factual allegations to suggest that any of Broadcom's competitors were actually foreclosed from supplying either Samsung or any other desired buyers during or after the six-month duration of the Strategic Agreement.

**F.     Samsung's Claims**

Notwithstanding the six month, non-exclusive duration of the Strategic Agreement, which Samsung acknowledges neither foreclosed Broadcom's competitors nor precluded Samsung from securing alternative sources for the "Critical Components," Samsung asserts claims of exclusive dealing, tying, and monopolization.[3]

---

[3] While Samsung points to a Korea Fair Trade Commission ("KFTC") investigation to support its claims (Compl. ¶ 11), Samsung is incorrect that the ongoing KFTC proceeding involved a finding that Broadcom "violated Korean antitrust law."  Rather, the KFTC's finding—now on appeal—was that a unique Korean claim for "abuse of superior bargaining position" was supported.  *See* KFTC Sanctions Broadcom for Coercing Samsung Electronics Into Unfavorable Long-Term Agreement for the Supply of Smart Device Components, KFTC (Sept. 21, 2023), https://www.ftc.go.kr/solution/skin/doc.html?fn=f7c3b3ec95e05c3709148f12c1d22c3487eae3c7 7966d33eeb3988c350a94a13&rs=/fileupload/data/result/BBSMSTR_000000002402/; Types of Unfair Trade Practices:  Abuse of Superior Bargaining Position, Korea Fair Trade Commission, https://www.ftc.go.kr/eng/contents.do?key=3076.  In any event, alleged violations of foreign law

***Samsung's Gerrymandered Product Markets.*** Samsung's claims are premised on three alleged product markets, which Samsung defines coextensively with the custom-specified chips that it purchased from Broadcom: (i) Phone Standalone Bluetooth/WiFi Chip Market; (ii) Phone Standalone GNSS/GPS Chip Market; and (iii) OMH LPAMiD Module Market. *Id.* ¶¶ 27–41.

Samsung alleges that while "[a]ll smartphones support BT/Wi-Fi functionality," different smartphones use different components to do so. *Id.* ¶ 28. Excluding the "integrated BT/Wi-Fi" functionality that "[l]ower-end mass-market smartphones frequently use," Samsung narrows the "Phone Standalone Bluetooth/Wi-Fi Market" to only components targeted at "high-end smartphones," notably Samsung's "Flagship" devices and Apple's iPhones. *Id.* Samsung distinguishes these methods of providing Bluetooth and Wi-Fi functionality in smartphones solely on the basis that integrated solutions are "not as technically advanced" and lack "advanced features" that make them unfit for Samsung's "high-end" smartphones. *Id.* ¶¶ 28–29. Given the technological rigidity and bespoke nature with which Samsung defines the market, Samsung eliminates other producers to conclude that "Broadcom has been the sole merchant global supplier of phone standalone BT/Wi-Fi chips." *Id.* ¶ 43. Yet Samsung now sources Bluetooth/Wi-Fi chips from Qualcomm. *Id.* ¶ 45.

Samsung similarly narrows its "Phone Standalone GNSS/GPS Chip Market," solely on the basis of technological distinctions and fitness for Samsung's phones. *Id.* ¶¶ 33–37. Specifically, Samsung notes that a subset of Samsung's smartphones use a specific Application Processor that lacks "integrated GNSS/GPS functionality" and requires the use of "standalone GNSS/GPS chips" like the ones Broadcom produces to provide the same functionality. *Id.* ¶ 34. By gerrymandering the market around Samsung's specific needs and technical specifications, Samsung once again reaches the conclusion that "Broadcom has been the sole competitor in the Global Phone Standalone GNSS/GPS Chip Market." *Id.* ¶ 47.

---

do not bear on whether Samsung has pled any viable antitrust claim under U.S. law. *See In re German Auto. Manuf. Antitrust Litig.*, 392 F. Supp. 3d 1059, 1070 (N.D. Cal. 2019) ("European and American antitrust laws are not uniform, so Defendants' possible violation of European cartel law does not necessarily mean that they violated the Sherman Act."); *In re Capacitors Antitrust Litig.*, 106 F. Supp. 3d 1051, 1064 (N.D. Cal. 2015) (finding that government investigations by Chinese, Japanese, South Korean, Taiwanese, and European government authorities "carry no weight" as to whether plaintiffs alleged plausible claims for relief).

Maintaining the same pattern, Samsung's "OMH LPAMiD Module Market" is defined around "[o]ne-module Mid/High LPAMiD components" that combine the functionality of four discrete components and "have a technical advantage over [those] discrete components in terms of both size/compactness and device performance." *Id*. ¶ 39. Yet Qorvo, and more recently Qualcomm, offer OMH LPAMiD modules that also meet Samsung's standards. *Id*. ¶ 54. By narrowly defining this market around the specific "one-module Mid/High LPAMiD components" that Samsung's smartphones and Apple's iPhone use, Samsung claims that Broadcom's share of the "Global OMH LPAMiD Module Market" exceeded 70%. *Id*. ¶ 56.

***Samsung's Exclusive Dealing Claims.*** Samsung alleges violations of exclusive dealing, under Section 3 of the Clayton Act, 15 U.S.C. § 14, and Section 1 of the Sherman Act, 15 U.S.C. § 1, on the theory that it had to purchase 100 percent of its BT/Wi-Fi chips and OMH LPAMiD Modules from Broadcom "for more than one year" due to the Strategic Agreement. *Id*. ¶¶ 101, 106. Samsung does not allege that the Strategic Agreement required exclusivity, but asserts that the amount Samsung agreed to pay Broadcom resulted in "*de facto* 100 percent exclusive dealing" for Samsung's needs for BT/Wi-Fi chips and OMH LPAMiD modules. *Id*. ¶¶ 101–09. In other words, after limiting the market to the specific Critical Components it asked Broadcom to develop, Samsung claims that the Strategic Agreement constitutes an unlawful exclusive dealing agreement because it obtained most if not all of the Critical Components from Broadcom for a period of time.

***Samsung's Tying Claim.*** Samsung also asserts claims of tying under Section 3 of the Clayton Act, 15 U.S.C. § 14, and Section 1 of the Sherman Act, 15 U.S.C. § 1, alleging that its purchase of OMH LPAMiD modules was tied to Samsung's purchase of BT/Wi-Fi and GNSS/GPS chips. *Id.* ¶¶ 110–31. Despite the absence of any tying provision in the Strategic Agreement, Samsung vaguely alleges that the Annual Commitment it agreed to in the Strategic Agreement "rendered it commercially unviable" to purchase OMH LPAMiD Modules from other sources if it wanted to purchase BT/Wi-Fi or GNSS/GPS chips from Broadcom. *Id*. ¶¶ 111, 115, 122, 126.

***Samsung's Monopolization Claims.*** Samsung also asserts claims of monopolization and attempted monopolization under Section 2 of the Sherman Act, 15 U.S.C. § 2, on the basis that Broadcom monopolized or attempted to monopolize the markets for Standalone BT/Wi-Fi chips

through the alleged exclusive dealing and tying arrangements.  *Id.* ¶¶ 136–37.

*Samsung's Cartwright Act Claims.*  Finally, Samsung alleges exclusive dealing and tying under the Cartwright Act, Cal. Bus. & Prof. Code §§ 16720, 16727.  Compl. ¶¶ 138–69.  These claims are premised on its federal exclusive dealing and tying claims.  *Id.*

*Requested Relief.*  Samsung seeks treble damages and a permanent injunction precluding Broadcom from "repeating the anticompetitive conduct described in [the] Complaint," even though the Strategic Agreement has terminated and Samsung admittedly now obtains Critical Components from Qualcomm and others.  *Id.* ¶ 45.

## IV.   LEGAL STANDARD

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007).  A court need not accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).  "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (simplified).  In antitrust cases, "a court must determine whether an antitrust claim is plausible in light of basic economic principles." *Coal. For ICANN Transparency, Inc. v. Verisign, Inc.*, 611 F.3d 495, 501 (9th Cir. 2010) (simplified).

## V.   ARGUMENT

### A.   Samsung's Claims Are Time-Barred

Samsung's claims are time-barred and should be dismissed.  *First*, the execution of the Strategic Agreement, occurred outside the four-year statute of limitations.  *Second*, Samsung cannot invoke the continuing violations exception to restart the statute of limitations, as there were no new and independent overt acts by Broadcom within the limitations period.

#### 1.   All Alleged Conduct, Including the Execution of the Strategic Agreement, Occurred Outside the Four-Year Statute of Limitations

All nine of Samsung's claims, brought under the Sherman Act, Clayton Act, and Cartwright Act, are subject to four-year statutes of limitations.  *See In re Animation Workers*

*Antitrust Litigation*, 87 F. Supp. 3d 1195, 1208 (N.D. Cal. 2015) ("[C]laims under the Sherman Act [and] Cartwright Act . . . are all subject to a four-year statute of limitations."); 15 U.S.C § 15b; Cal. Bus. & Prof. Code § 16750.1.  The limitations period begins to run "from the commission of the act."  *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 237 (9th Cir. 1987).  Courts can dismiss claims as time-barred when "the running of the statute [of limitations] is apparent on the face of the complaint."  *Huynh v. Chase Manhattan Bank*, 465 F.3d 992, 997 (9th Cir. 2006).

Here, the "commission of the act" underlying Samsung's antitrust claims occurred outside the four-year statute of limitations.  Specifically, Broadcom's alleged conduct leading up to the execution of the Strategic Agreement all occurred in 2019 and in the spring of 2020.  *See* Compl. ¶¶ 4–7, 58–74.  The Strategic Agreement itself was executed on March 27, 2020.  *Id*. ¶ 76. Samsung brought its claims more than four years later, on July 1, 2024.  ECF No. 1.  Therefore, all of its claims are time-barred under the four-year statute of limitations under the Sherman Act, Clayton Act, and Cartwright Act.[4]  *See Animation Workers*, F. Supp. 3d at 1208.

### 2.    Samsung Cannot Plead a Continuing Violation Sufficient to Restart the Antitrust Statute of Limitations

Samsung cannot circumvent the statute of limitations by relying on the continuing violations exception.  This exception requires plausibly alleging an "overt act" by Broadcom within the limitations period that both (1) is "a new and independent act that is not merely a reaffirmation of a previous act;" and (2) "inflict[s] new and accumulating injury on the plaintiff." *Samsung Elecs. Co. Ltd. v. Panasonic Corp.*, 747 F.3d 1199, 1202 (9th Cir. 2014).  This standard differentiates "those cases where a continuing violation is ongoing—and an antitrust suit can therefore be maintained—from those where all of the harm occurred *at the time of the initial violation*."  *Id*. (emphasis added).  "Merely carrying out during the limitations period a final, binding decision made prior to the limitations period does not qualify as a new overt act" that would trigger the continuing violation doctrine.  *Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044,

---

[4] Samsung's request for injunctive relief is moot given that the allegedly unlawful contract—the Strategic Agreement—was terminated in June 2021.  The request for injunctive relief is also barred by laches, given that the antitrust damages claims are time-barred.  *See Jarrow Formulas, Inc. v. Nutrition Now, Inc*., 304 F.3d 829, 836 (9th Cir. 2002) ("[I]f [a] suit is filed outside of the analogous limitations period, courts often have presumed that laches is applicable.").

1071–72 (N.D. Cal. 2016).  Where all the harm occurred at the time of the initial violation such that the alleged antitrust violation was an "irrevocable, immutable, permanent and final" decision, any subsequent damages during the limitations period "necessarily resulted from" and "were but unabated inertial consequences of some pre-limitations action" and therefore do not restart the statute of limitations.  *AMF, Inc. v. General Motors Corp.* (*In re Multidistrict Vehicle Air Pollution*), 591 F.2d 68, 72 (9th Cir. 1979) (internal quotations omitted).

In the context of allegedly anticompetitive contracts, courts in this Circuit and others have recognized that neither performance of the contract's terms nor the continued receipt of benefits under the contract constitute overt acts that restart the limitations period.  *See Eichmann v. Fotomat Corp.*, 880 F.2d 149, 160 (9th Cir. 1989) (holding that defendant's continued receipt of lease payments under an alleged tying agreement were not overt acts, but merely passive conduct).  And the receipt of financial benefits that flow from the initial alleged antitrust violation do not constitute overt acts sufficient to restart the statute of limitations.  *See Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 600 (6th Cir. 2014) ("[P]rofits, sales, and other benefits accrued as the result of an initial wrongful act are not treated as 'independent acts' [but instead] . . . are uniformly viewed as 'ripples' caused by the initial injury, not as distinct injuries themselves.").

The Strategic Agreement's effective date of January 1, 2021, does not constitute an overt act sufficient to restart the statute of limitations.  The Strategic Agreement became an "irrevocable, immutable, permanent and final decision" when the parties executed it in March 2020. *See AMF*, 591 F.2d at 72.  All of its terms were finalized and permanent at the time of the contract's execution.  That the Strategic Agreement came into effect during the limitations period is an "unabated inertial consequence" of the pre-limitation contract and thus "merely a reaffirmation" of its terms, not any "new or independent act." *See id.*; *Samsung*, 747 F.3d at 1202.  Broadcom undertook no further act following the March 2020 execution of the Strategic Agreement for it to go into effect and there was, thus, no later overt act.

In addition, all "rights and liabilities" of Samsung and Broadcom were "finalized by the contracts executed [before the limitations period]" such that the contract coming into effect "merely implemented" the terms as finalized at execution. *Electroglas, Inc. v. Dynatex Corp.*, 497

F. Supp. 97, 106 (N.D. Cal. 1980).  Consequently, all of the alleged harm to Samsung from the allegedly anti-competitive agreement occurred "at the time of the initial violation"—here, at the time of the initial contract execution and signing.  *See Samsung*, 747 F.3d at 1202.  The effective date did not trigger any "new [or] accumulating injury on the plaintiff" that was not already implicated by virtue of the contract's execution.  *See id.*  Any subsequent damages during the limitations period Samsung claims to have sustained "necessarily resulted from" both parties' decisions to execute the contract.  *See AMF*, 591 F.2d at 72.

Moreover, Broadcom's continued receipt of "profits, sales, and other benefits accrued as the result" of executing the Strategic Agreement are not treated as "independent acts" or "distinct injuries" but rather as "ripples" caused by execution of the Strategic Agreement such that no new, independent act exists to restart the limitations period.  *See Z Techs.*, 753 F.3d at 600.  In *Eichmann*, the Ninth Circuit recognized that the "passive receipt of profits from an [allegedly] illegal contract by an antitrust defendant is not an overt act of enforcement which will restart the statute of limitations," and affirmed the dismissal of plaintiff's tying claims because each lease payment plaintiff paid to defendant did not constitute a "new injury for purposes of the statute of limitations."  880 F.2d at 160.  Here, too, Broadcom's "passive receipt of profits" for the chips Broadcom sold Samsung under the Strategic Agreement do not constitute "new injur[ies]" or overt acts sufficient to restart the limitations period.  *See id.*

**B.**  **Samsung Fails to Plead Any Injury to Itself or Competition**

**1.**  **Samsung Suffered No Injury-In-Fact and Lacks Article III Standing**

Article III standing is "a jurisdictional prerequisite to the consideration of any federal claim."  *Gerlinger v. Amazon.com, Inc.*, 526 F.3d 1253, 1255 (9th Cir. 2008) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).  Jurisdictional standing requires a showing of injury-in-fact, causation, and redressability.  *See Lujan*, 504 U.S. at 560–66.  In antitrust cases, the standing inquiry asks whether the plaintiff "has suffered an injury which bears a causal connection to the alleged antitrust violation."  *Lucas Auto. Eng'g., Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1232 (9th Cir. 1998).

Samsung has not pleaded any actionable injury-in-fact.   The sum and substance of

Samsung's alleged harm is that it was subject to the Strategic Agreement—which it negotiated with Broadcom, and later agreed to terminate. Samsung surmises that purchasing from other manufacturers "was not economically viable given Samsung's need to minimize its costs" (Compl. ¶ 8); that it "was forced to purchase" all of its "Critical Components" from Broadcom (*id*. ¶ 9); and that it was forced to pay higher prices for the relevant products than it otherwise would have with its multi-sourcing strategy (*id*. ¶¶ 87, 97, 117, 128, 136, 141, 146, 155, 166). But all of these conclusory allegations of injury are undermined by the factual allegations in the Complaint. Samsung admits it *was* able to multi-source components in 2019—months *before* it entered into the Strategic Agreement. *Id*. ¶¶ 5, 59. It sourced chips from Qorvo before and during the Strategic Agreement. *Id*. ¶¶ 54, 60, 85. Samsung also admits that, following termination of the Strategic Agreement, it was able to source BT/Wi-Fi chips from Qualcomm. *Id*. ¶ 45. By its own admissions, at all times Samsung was able to negotiate and secure alternate supply for its desired chips and, following termination of the agreement, immediately began sourcing components from Qualcomm. Samsung's business never skipped a beat and its production and sale of smartphones continued apace before, during, and after the Strategic Agreement.

Additionally, Samsung does not make any specific claims regarding the prices that it paid as a result of the Strategic Agreement. Instead, Samsung relies on conclusory allegations that the Strategic Agreement "resulted in . . . higher prices" and prevented Samsung from "being [able] to source components from a lower cost competing supplier." *Id*. ¶¶ 10, 104. This is insufficient to plead injury-in-fact. *See Pistacchio v. Apple Inc*., No. 4:20-cv-07034-YGR, 2021 WL 949422, at *2 (N.D. Cal. Mar. 11, 2021) (dismissing Sherman Act § 2 claims because "[t]he complaint is wholly lacking in any substantive allegations regarding the alleged 'supracompetitive' price. Such a bald conclusory statement is insufficient."); *Arcell v. Google LLC*, No. 5:22-cv-02499-EJD, 2023 WL 5336865, at *5 (N.D. Cal. Aug. 18, 2023) (finding that "vague and conclusory allegations as to injury: prices are higher, production is lower, innovation is suppressed, quality is less . . . , [and] user choice is reduced" were "insufficient as plead [sic] to establish antitrust injury"). By its terms, the Strategic Agreement—which the parties negotiated at arm's length—did not set the prices that Samsung would pay. Rather, it set a minimum spend amount, leaving prices to ███████████

1  ███████████████████████████████████████████████████████

2  ██████████████████████████████████████████████████  Ex. 1 at

3  1. Samsung was free to negotiate pricing for individual "Critical Components" with Broadcom

4  and other manufacturers as it saw fit. The Strategic Agreement served as a backstop, justifying

5  the significant investments Broadcom undertook to innovate and produce cutting-edge

6  components, at the discretion of Samsung, for Samsung's competitive benefit. Samsung has not

7  pled any non-conclusory or non-speculative injuries and therefore lacks Article III standing.

8  **2.   Samsung Fails to Plead the Requisite Harm to Competition**

9  Samsung also has not, and cannot, plausibly allege harm to competition in any of the three

10  alleged markets. This is fatal to all of its claims. *See PNY Techs., Inc. v. SanDisk*, No. 11-cv-

11  4689-WHO, 2014 WL 1677521, at *5–6 (N.D. Cal. 2014) (dismissing exclusive dealing claim

12  where plaintiff failed to plead that exclusive dealing arrangements for USB flash memory products

13  substantially foreclosed competition); *Bakay v. Apple Inc.*, No. 24-cv-00476-RS, 2024 WL

14  3381034, at *3–5 (N.D. Cal. July 11, 2024) (dismissing conspiracy and monopolization claims

15  given plaintiffs' failure to plead antitrust injury); *Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019,

16  1033–34 (N.D. Cal. 2015) (dismissing tying and exclusive dealing claims in part for failure to

17  establish antitrust injury).

18  To plead antitrust injury, a plaintiff must plead an injury "of the type the antitrust laws

19  were intended to prevent." *Glen Holly Entm't, Inc. v. Tektronix Inc.*, 343 F.3d 1000, 1008 (9th

20  Cir. 2003). "[T]he central purpose of the antitrust laws, state and federal, is to preserve

21  competition." *Id*. at 1010 (quoting *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988

22  (9th Cir. 2000)). Absent a showing of foreclosure of competition, merely establishing harm to a

23  plaintiff is insufficient to state a claim under the antitrust laws. *PNY*, 2014 WL 2987322, at *9–10.

24  While Samsung offers many conclusory allegations that Broadcom's conduct

25  "substantially foreclosed" competition in the OMH LPAMiD module and Bluetooth/Wi-Fi chip

26  markets, the actual factual allegations in the Complaint confirm the opposite. Samsung alleges

27  that competition existed prior to the Strategic Agreement, competitors provided the "Critical

28  Components" that were used by Samsung during the Strategic Agreement, and competitors were

1   fully able to pick up Samsung's business following termination of the Strategic Agreement.  All

2   of this undermines any plausible inference that there was any harm to competition, which is fatal

3   to all of Samsung's antitrust claims.

4          Specifically, Samsung pleads that in 2019, "nascent competition to Broadcom" existed.

5   Compl. ¶ 59.  Samsung also pleads that "[d]uring the relevant time period," Samsung purchased

6   and used OMH LPAMiD modules from both Broadcom and Qorvo.  *Id.* ¶¶ 54, 60.  And since the

7   termination of the Strategic Agreement, Samsung "has recently begun sourcing BT/Wi-Fi chips

8   from Qualcomm" (*id.* ¶ 45).  Furthermore, Broadcom and Samsung specifically contemplated and

9   agreed to ███████████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████████████████████

11  ████████████████████████████████████████████████████████████████████

12  ██████████    *See* Ex. 1 at 3–4.

13         As courts in this district have noted, in order to overcome the "short duration and easy

14  terminability" of an agreement, an exclusive-dealing plaintiff must plead that "despite their terms,

15  the contracts have the 'practical effect' of unreasonably suppressing competition."  *PNY*, 2014 WL

16  2987322, at *4.  The court's findings in *PNY* are particularly applicable here.  The plaintiff in *PNY*

17  failed to plead any foreclosure of competition where, "despite [defendant's] allegedly exclusive

18  relationship with [a retailer] . . . , [the retailer] ha[d] tested two other manufacturers' products."

19  *Id.* at *6.  The *PNY* court held "[i]t is not enough for [plaintiff] to simply observe that [defendant]

20  has gained several contracts through the years while [plaintiff] has been unable to do so and that

21  [defendant] has maintained existing ones—[plaintiff] must plead facts plausibly showing that

22  [defendant's] contracts have the practical effect of wrongfully foreclosing competition."  *Id.*  And

23  allegations that "because [defendant] is the category leader . . . , retailers feel compelled to carry

24  its products and are powerless against [defendant's] insistence on exclusivity" were deemed by the

25  court to be "conclusory, overly general, and speculative[,]" particularly when "contradicted by

26  other portions" of the complaint.  *Id.* at *7.  The sum and substance of Samsung's allegations are

27  no different.

28         Indeed, Samsung's alleged injury does not flow from harm to competition in any of its

alleged markets for Critical Components.  At best, Samsung alleges that it doesn't like the contract it entered into more than four years ago.  *See Glob. Tel\*Link Corp. v. JACS Sols. Inc*., No. 1:23-cv-179, 2023 WL 8918281, at \*6 (E.D. Va. Dec. 27, 2023) ("Caution about antitrust injury is especially important when cases involve both contractual and antitrust claims, since it is easy for a claim of breach—or simply contractual sour grapes—to masquerade as a candidate for treble damages.") (simplified).  This is confirmed by Samsung's failure to allege that after the termination of the Strategic Agreement, the market became less competitive, it faced higher prices, or—most importantly—that it failed to secure alternate supply.  Rather, Samsung immediately sourced alternate supply from Qorvo and Qualcomm and its production of phones has continued apace.  Compl. ¶¶ 45, 54.  So regardless of the competitive effects of the Strategic Agreement, Samsung would still have the same claim—not wanting to pay the prices it agreed to from Broadcom and not being able to "diversify" its supply during the Strategic Agreement so to speak. *See id*. ¶ 10 (alleging "Samsung was foreclosed from purchasing Critical Components from alternative suppliers"); ¶ 87 (alleging "Samsung was prevented from implementing its procompetitive multi-sourcing strategy.").

These are exactly the kind of allegations found insufficient in *Glob. Tel\*Link*, where claims that "the challenged exclusive dealing provision has 'hindered [plaintiff's] ability to compete vigorously for customers' [and] 'removed [plaintiff's] capacity from the market'" failed to establish antitrust injury.  *Glob. Tel\*Link*, 2023 WL 8918281, at \*7.  That court found that these allegations established only that the plaintiff "is bound by the exclusive dealing contract at issue," which "is a contract injury, not an antitrust injury."  *Id*.  The same is true here.  Samsung's alleged injuries, at best, flow from the Strategic Agreement itself, and not any harm to competition.  *See id*. (finding plaintiff "'would have suffered the identical "loss" but no compensable injury if the exclusive dealing contract had no anticompetitive effect at all" and plaintiff's injury was "not dependent on the existence of an antitrust violation").  And, even if Samsung could plead contractual damages, "[w]here the defendant's conduct harms the plaintiff without adversely affecting competition generally, there is no antitrust injury."  *Pac. Steel Grp. v. Comm. Metals Co*., No. 20-cv-07683-HSG, 2024 WL 3236705, at \*9 (N.D. Cal. June 28, 2024).

At bottom, Samsung is trying to turn its contractual buyer's remorse into an antitrust claim. The failure to plead antitrust injury and harm to competition dooms all of its federal and state law exclusive dealing, tying, and monopolization claims.  *See PNY*, 2014 WL 2987322, at *11; *Bakay*, 2024 WL 3381034, at *8; *Feitelson*, 80 F. Supp. 3d at 1033–34.

### C.  Samsung's Exclusive Dealing Claims Fail

#### 1.  The Strategic Agreement, Which Did Not Require Exclusivity and Remained in Effect for Only Six Months, Cannot Be Exclusive as a Matter of Law

"[T]here are well-recognized economic benefits to exclusive dealing arrangements, including the enhancement of interbrand competition."  *FTC v. Qualcomm Inc.*, 969 F.3d 974, 1003 (9th Cir. 2020) (quoting *Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997)); *see also E. Food Servs., Inc. v. Pontifical Cath. Univ. Servs. Ass'n, Inc.*, 357 F.3d 1, 8 (1st Cir. 2004) (exclusive contracts "may be highly efficient—to assure supply, price stability, outlets, investment, best efforts or the like—and pose no competitive threat at all").  An exclusive dealing arrangement "violates the Sherman Act under the rule of reason only if its effect is to foreclose competition in a substantial share of the line of commerce affected."  *Qualcomm*, 969 F.3d at 1003 (internal quotation marks omitted); *see also PNY*, 2014 WL 2987322, at *4 (quoting *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 (9th Cir. 2010)) (similar).  True exclusive dealing involves contracts that are both exclusionary enough in nature and long enough in duration to force competitors out of the market.  Here, the Strategic Agreement had no such effect because it was not exclusive by its terms, was in effect for a mere six months, and did not foreclose Broadcom's competitors in any way.

Nowhere did the Strategic Agreement preclude Samsung from purchasing or using Bluetooth/Wi-Fi chips or OMH LPAMiD Modules from suppliers other than Broadcom.  In fact, the Strategic Agreement is ██████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████.  *See* Ex. 1 § F.  The Strategic Agreement ████████ ████████████████████████.  Rather, it set forth ████████████████████████ ██████████████████████████████████████████████████████████.

1   *See id.* § C (Broadcom ████████████████████████████████████

2   ████████████████████████████████████████████████████████████████

3   ████████████████████████████████████████████████████████████████

4   ████████████████████████████████████████████ (emphasis added).

5   Samsung was free to engage other suppliers, while keeping Broadcom at the ready if hangups in

6   production or any technical issues arose with Samsung's new partners.  This was in no way the

7   "*de facto* 100 percent exclusive dealing" circumstance as Samsung claims.  Compl. ¶¶ 101, 106.

8        In fact, Samsung *recognizes* that the Strategic Agreement was not exclusive and did not

9   foreclose Broadcom's competitors from supplying to Samsung or foreclose Samsung from seeking

10  alternate sources of supply.  *See id.* ¶¶ 8; 77 (describing Samsung's purchasing requirement under

11  the Strategic Agreement as an "annual minimum volume" of purchase of Critical Components).

12  Samsung also admits that both Qualcomm and Qorvo became alternative suppliers.  *See id.* ¶ 45

13  ("Qualcomm has recently launched a phone standalone BT/Wi-Fi chip in competition with

14  Broadcom and Samsung and recently begun sourcing BT/Wi-Fi chips from Qualcomm."), ¶ 54

15  ("During the relevant time period, Samsung purchased OMH LPAMiD Modules from both

16  Broadcom and Qorvo.  Samsung used OMH LPAMiD chips from both Broadcom and Qorvo in

17  its Flagship Devices in the United States. . . .  Apple has also purchased OMH LPAMiD chips

18  from both Broadcom and Qorvo during the relevant time period.").  This is dispositive.  *See*

19  *Qualcomm*, 969 F.3d at 1004 (exclusive contracts did not foreclose competition because "it is

20  undisputed that Intel won Apple's business *the very next year*" (emphasis in original)).

21       This case again draws strong parallels to *PNY v. SanDisk*, in which the court dismissed an

22  exclusive dealing claim premised on the plaintiff's attempt to mischaracterize a non-exclusive

23  policy by arguing that "[s]ome of SanDisks's written exclusive dealing agreements have

24  provisions that make it very difficult or expensive for retailers to terminate the agreement."  *PNY*,

25  2014 WL 2987322, at *2; *cf.* Compl. ¶ 8 (alleging that paying twice for the same component under

26  the "take or pay" provision was not economically viable and therefore the Strategic Agreement

27  functioned as a de facto exclusive dealing agreement).  The court rejected this, concluding that

28  (beyond naked assertions) the complaint "is devoid of any indication that SanDisk engaged in

anticompetitive conduct to preclude retailers from considering PNY or other manufacturers or to prevent PNY or other manufacturers from approaching retailers with better offers than SanDisk such that SanDisk's agreements have the practical effect of substantially foreclosing competition." *Id.* at *5–7. Similarly, Samsung does not and cannot allege that Broadcom prevented any competitor from offering more favorable terms to Samsung to draw it away from Broadcom, that Samsung was prevented from accepting a better deal offered by another chip supplier, or that a competitor failed to win Samsung's business despite offering better terms than Broadcom.

Furthermore, "the short duration and easy terminability of [] agreements negate substantially their potential to foreclose competition." *PNY*, 2014 WL 2987322, at *4 (citation omitted). "If the contracts at issue are short-term or easily terminated, a competing manufacturer need only offer a better product or a better deal to get contracts of its own." *Id.* (simplified). Here, the Strategic Agreement was in effect for merely six months: from January 1, 2021 to July 2, 2021. Compl. ¶¶ 76, 90. The fact that the Strategic Agreement did not foreclose competition coincides with unanimous precedent holding that contracts of less than a year cannot be unlawfully exclusive *as a matter of law. See Omega*, 127 F.3d at 1163–64 (holding one-year contracts to be presumptively legal against exclusive dealing challenge); *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 395 (7th Cir. 1984) (exclusive contracts terminable in less than one year are presumptively lawful); *FTC v. Motion Picture Adver. Serv. Co.*, 344 U.S. 392, 396 n.2 (1953) ("[A]n exclusive . . . agreement for a period of one year is not an undue restraint upon competition."); *Paddock Publications, Inc. v. Chicago Tribune Co.*, 103 F.3d 42, 47 (7th Cir. 1996) ("exclusive dealing contracts are lawful if limited to a year's duration" because "exclusivity can promote competition by making it feasible for firms to invest"); *PNY*, 2014 WL 1677521, at *5 (one- to three-year contracts not long enough to support exclusive dealing claims).

### 2. Samsung's Alleged Foreclosure Shares are Premised on Implausible, Gerrymandered Markets

Samsung's exclusive dealing claim also fails because it is built entirely upon a number of fictitious, implausible product markets limited almost exclusively to Broadcom's product. To begin with, each of these three alleged product markets are effectively all implausible, single-brand

markets, which are exceedingly rare, and disfavored.  *See Reilly v. Apple Inc.*, 578 F. Supp. 3d 1098, 1107 (N.D. Cal. 2022); *In re ATM Fee Antitrust Litig.*, 768 F. Supp. 2d 984, 995 (N.D. Cal. 2009).  Defining the markets improperly is the only way Samsung can allege the necessary foreclosure share needed for an exclusive dealing claim.  But an appropriate measure of foreclosure requires a market that includes all "sellers or producers who have actual or potential ability to deprive each other of significant levels of business."  *ATM Fee*, 768 F. Supp. 2d at 994.  A market defined too narrowly prevents the Court from appropriately assessing market foreclosure, because a proper "foreclosure calculation includes the full range of selling opportunities reasonably open to rivals, namely, all the product and geographic sales they may readily compete for, using easily convertible plants and marketing organizations."  *Omega*, 127 F.3d at 1163 (simplified).

Samsung's admissions regarding how other suppliers were able to enter into the markets and supply Samsung with components also undermine the notion that Broadcom has monopoly power in each of three alleged product markets and confirm that Samsung has not included all sellers in its foreclosure allegations.  *See, e.g.,* Compl. ¶¶ 5, 59 (in 2019, "nascent competition to Broadcom" enabled Samsung to pursue "a multi-sourcing strategy that would include procuring significant quantities of Critical Components from Broadcom's competitors"); ¶ 45 ("Qualcomm has recently launched a phone standalone BT/Wi-Fi chip in competition with Broadcom and Samsung has recently begun sourcing BT/Wi-Fi chips from Qualcomm"); ¶ 54 ("During the relevant time period, Samsung purchased OMH LPAMiD modules from both Broadcom and Qorvo."); ¶ 75 ("competitive alternatives to Broadcom components were available").

Samsung's attempts to distinguish competing products based on their technological aspects and its own preferences also fail as a matter of law.  *See Streamcast Networks, Inc. v. Skype Techs., S.A.*, 547 F. Supp. 2d 1086, 1095 (C.D. Cal. 2007) ("unique attributes and components" that make a product "more attractive and efficient" do not distinguish it from other products that "permit users to accomplish the same basic task").[5]  Samsung's basis for isolating Broadcom's "Phone

---

[5] *See also In re Super Premium Ice Cream Distrib. Antitrust Litig.*, 691 F. Supp. 1262, 1268 (N.D. Cal. 1988) ("Courts have repeatedly rejected efforts to define markets by price variances or product quality variances. Such distinctions are economically meaningless where the differences are actually a spectrum of price and quality differences."; collecting authorities).

1  Standalone BT/Wi-Fi" chips and "OMH LPAMiD Module[s]" into their own product markets is

2  that these chips are customized for Samsung's high-end Galaxy phones and alternatives were "not

3  as technically advanced" and "technologically inferior."  Compl. ¶¶ 29, 53.  But Samsung cannot

4  plausibly define product markets in a way to manufacture the requisite foreclosure share by

5  ignoring all other selling opportunities open to rivals.  Further, "the law prohibits an antitrust

6  claimant from resting on market power that arises solely from contractual rights that consumers

7  knowingly and voluntarily gave to the defendant." *Newcal Indus. v. Ikon Office Sol.*, 513 F.3d

8  1038, 1048 (9th Cir. 2008).[6]  The Strategic Agreement therefore cannot serve as a basis for

9  Samsung to limit the alleged markets around the "Critical Components" that Broadcom developed

10  for Samsung.  The markets must instead consider those producers capable of servicing Samsung's

11  needs, of which Samsung admits there is "nascent competition." Compl. ¶ 59.  Samsung's alleged

12  product markets are improperly "contorted to meet [its] litigation needs," *Hicks v. PGA Tour, Inc.*,

13  897 F.3d 1109, 1121 (9th Cir. 2018), and are fatal to its exclusive dealing claims.

14       **D.**    **Samsung's Tying Claims Fail**

15       "A tying arrangement is a device used by a seller with market power in one product market

16  to extend its market power to a distinct product market."  *Cascade Health Sols. v. PeaceHealth*,

17  515 F.3d 883, 912 (9th Cir. 2008).  "To accomplish this objective, the seller conditions the sale of

18  one product (the tying product) on the buyer's purchase of a second product (the tied product)."

19  *Id.*  "Tying arrangements are forbidden on the theory that, if the seller has market power over the

20  tying product, the seller can leverage this market power through tying arrangements to exclude

21  other sellers of the tied product."  *Id.*  Here, Samsung cannot allege a tying arrangement because

22  the Strategic Agreement did not condition the sale of any chips on Samsung's purchase of other

23  products and also because Samsung fails to properly allege a tying product market.

24

25  [6] *See  Oracle Am., Inc. v. Cedarcrestone, Inc*., 938 F. Supp. 2d 895, 903–908 (N.D. Cal. 2013); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436–41 (3d Cir. 1997) (rejecting a

26  single brand aftermarket relating to pizza ingredients for Domino's franchisees, where the franchise agreement required franchisees to purchase ingredients from Domino's or authorized vendors); *Apple Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1200–03 (N.D. Cal.

27  2008) (defendant failed to plead a plausible aftermarket for Mac OS-compatible hardware because through "its End User License Agreement and other means, Apple specifically restricts

28  the use of Mac OS to Apple-labeled computer hardware systems," and "[c]ustomers, therefore, knowingly agree to the challenged restraint.").

1  **1.      There Is No Unlawful Tie Because the Strategic Agreement Did Not**
2  **Condition the Sale of Phone Standalone BT/Wi-Fi Chips or the Sale of**
   **GNSS/GPS Chips on the Purchase of OMH LPAMiD Modules**

3        Samsung admits that "the Strategic Agreement *did not expressly condition* Broadcom's

4  sale of phone standalone BT/Wi-Fi Chips on Samsung's agreement to purchase OMH LPAMiD

5  Modules from Broadcom" and that "the Strategic Agreement *did not expressly condition*

6  Broadcom's sale of phone GNSS/GPS Chips on Samsung's agreement to purchase OMH LPAMiD

7  chips from Broadcom." Compl. ¶¶ 111, 122 (emphasis added).  The Strategic Agreement was

8  merely an agreement to meet Samsung's needs as they arose. █████████████████████

9  ████████████████████████████████████████████████████████████

10 ██████████████████ *Id.* § C ███████████████████████

11 ████████████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████████████

13 ████████████████████████████ (emphasis added).  In other words, the Strategic

14 Agreement ███████████████████████████████████████████████

15 █████████████████████ There is no basis to conclude that the Strategic Agreement

16 conditioned the sale of phone standalone BT/Wi-Fi chips or phone standalone GNSS/GPS chips

17 on Samsung's purchase of OMH LPAMid Modules from Broadcom.

18        Conceding that the Strategic Agreement placed no such conditions, Samsung instead

19 argues that "the terms of the Strategic Agreement (including the Annual Commitment) rendered

20 it commercially unviable for Samsung to purchase Qorvo's or another manufacturer's OMH

21 LPAMiD Modules if it wished to procure [phone BT/Wi-Fi chips or phone GNSS/GPS chips]

22 from Broadcom," Compl. ¶¶ 111, 122, because "[p]aying twice for the same component—paying

23 Broadcom's competitor for the component and paying Broadcom under the 'take or pay'—was

24 not economically viable," *id.* ¶ 8.  But this is exactly what the Ninth Circuit held was not unlawful

25 in *FTC v. Qualcomm*.  There, Qualcomm's policy of "not sell[ing] chips to a cellphone [OEM]

26 like Apple or Samsung unless the OEM agrees to a license that requires it to pay a substantial per-

27 phone surcharge *even on phones that use rivals' chips*," was a "policy [that] raises the 'all-in' price

28 that an OEM must pay for modem chips (chipset + licensing royalties) regardless of which chip

1   supplier the OEM chooses to source its chips from." 969 F.3d at 1002 (emphasis in original). And

2   because the raised all-in price "involves potential harms to Qualcomm's customers, not its

3   competitors," the policy did not violate the Sherman Act. *Id.* The same is true here. The Strategic

4   Agreement did not preclude Samsung from purchasing OMH LPAMid Modules from Qorvo or

5   whomever it liked. It only provided for an annual payment by Samsung so that Broadcom could

6   invest in developing components for Samsung without bearing all of the financial risks if Samsung

7   chose alternate suppliers. At worst, the agreement resulted in Samsung paying a higher price for

8   its required chips. But that freedom remained, and the agreement did not harm *competition*.

9       **2.**    **Samsung's Alleged Tying Product Market Fails**

10       Tying claims require proof "that the defendant has market power in the tying product. And

11   to prove it, it must first be properly alleged." *Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532

12   F.3d 963, 971–72 (9th Cir. 2008). Here, Samsung fails to allege a cognizable tying product market

13   and thus fails to allege that Broadcom has any sort of market power for either tying product.

14       As discussed above at Section IV(C)(2), Samsung's Standalone BT/Wi-Fi Chip Market is

15   effectively an implausible single-brand market, which is "extremely rare." *Reilly*, 578 F. Supp. 3d

16   at 1107. Samsung again impermissibly centers this market on contractual obligations and technical

17   distinctions. *See Newcal*, 513 F.3d at 1048; *Streamcast Networks*, 547 F. Supp. at 1095.

18       Samsung's GNSS/GPS Chip market is similarly flawed, as it is premised on a contract to

19   which Samsung agreed. *See Newcal*, 513 F.3d at 1048. Samsung also artificially restricts its

20   GNSS/GPS Chip market due to technical differences, excluding "integrated GNSS/GPS

21   functionality" because a subset of Samsung's smartphones are incompatible with the integrated

22   feature and require standalone components. Compl. ¶ 34. This "unique attribute" cannot justify

23   exclusion from the market. *Streamcast*, 547 F. Supp. at 1095.

24       **E.**    **Samsung's Monopolization Claims Fail**

25       **1.**    **Samsung Fails to Plead Any Anticompetitive Conduct to Sustain a Monopolization Claim**

26       Because Samsung's monopolization claims are premised on exclusive dealing and tying,

27   its failure to adequately allege either offense warrants dismissal of its monopolization claims as

28   well. *See PNY*, 2014 WL 1677521, at *8–9 (dismissing monopolization claim premised on

1  exclusive dealing); *ProSearch Plus, LLC v. VFM Leonardo, Inc.*, No. SACV 12-2102-JST (ANx),

2  2013 WL 3936394, at *4 (C.D. Cal. July 30, 2013) (dismissing Sherman Act monopolization

3  claims "[b]ecause [defendant's] contracts are of relatively short duration and, crucially, can be

4  terminated upon short notice, they do not—by themselves—sustain the Sherman Act claims.");

5  *Dreamstime.com v. Google LLC*, 54 F.4th 1130, 1141–42 (9th Cir. 2022) (affirming dismissal of

6  monopolization claim where Plaintiff failed to allege any injury to competition by reason of

7  Google's conduct, and only harm to Plaintiff).

8          **2.**       **Samsung's Monopolization Claims Are Premised on an Implausible**
9                      **"Phone Standalone BT/Wi-Fi Chip Market"**

10          Samsung's monopolization claims fail because they are premised on an implausible,

11  single-brand market limited to the Phone Standalone BT/Wi-Fi Chip Market. *See supra* Sections

12  IV(C)(2) and IV(D)(2).   The "[f]ailure to identify a relevant market is a proper ground for

13  dismissing a Sherman Act claim." *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001)

14  (conclusory assertions that a product is "'unique' and hence 'not interchangeable with any other'

15  product are insufficient).  Samsung's flawed market based on Samsung's knowing entrance into a

16  contract and technical preferences for BT/Wi-Fi Chips fails as a matter of law.

17         **F.**     **Samsung's Cartwright Act Exclusive Dealing and Tying Claims Fail**

18          The analysis under the Cartwright Act is identical to that under the Sherman Act, so

19  Samsung's failure to plead exclusive dealing and tying under federal antitrust law dooms its two

20  Cartwright Act claims.  *Cty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir.

21  2001); *Name.Space, Inc. v. Internet Corp.*, 795 F.3d 1124, 1131 n.5 (9th Cir. 2015); *Ice Cream*

22  *Distributors of Evansville, LLC*, No. 09-5815 CW, 2010 WL 2198200, at *10 (N.D. Cal. May 28,

23  2010) (dismissing Cartwright Act claim premised on federal tying claim); *Stewart v. Gogo, Inc*.,

24  No. C–12–5164 EMC, 2013 WL 1501484, at *5 (N.D. Cal. Apr. 10, 2013) (dismissing Cartwright

25  Act claims for failure to plead a relevant market and substantial foreclosure).

26  **VI.**     **CONCLUSION**

27          This Court should dismiss the Complaint with prejudice.

28

1

Dated:  August 28, 2024

LATHAM & WATKINS LLP

2

3

By:   */s/ Christopher S. Yates*
        Christopher S. Yates

4

5

6

7

8

Christopher S. Yates (Cal. Bar No. 161273)
 *chris.yates@lw.com*
Belinda S Lee (Cal. Bar No. 199635)
 *belinda.lee@lw.com*
Aaron T. Chiu (Cal. Bar No. 287788)
 *aaron.chiu@lw.com*
505 Montgomery Street, Suite 2000
San Francisco, California 94111-6538
Telephone: +1.415.391.0600

9

10

11

Sean M. Berkowitz (*pro hac vice*)
 *sean.berkowitz@lw.com*
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone: +1.312.876.7700

12

13

*Attorneys for Defendants Broadcom Inc.,
Broadcom Corporation and Avago Technologies
International Sales Pte. Limited*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28