ARNOLD & PORTER KAYE SCHOLER LLP
DOUGLAS A. WINTHROP (Bar No. 183532)
Douglas.Winthrop@arnoldporter.com
DANIEL B. ASIMOW (Bar No. 165661)
Daniel.Asimow@arnoldporter.com
JEE HEUN ("JEENIE") KAHNG (Bar No. 348556)
jeenie.kahng@arnoldporter.com
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111-4024
Telephone:     415.471.3100
Facsimile:     415.471.3400

ARNOLD & PORTER KAYE SCHOLER LLP
JONATHAN I. GLEKLEN (*pro hac vice*)
Jonathan.Gleklen@arnoldporter.com
601 Massachusetts Ave., NW
Washington, DC 20001
Telephone:     202.942.5000
Facsimile:     202.942.5999

ARNOLD & PORTER KAYE SCHOLER LLP
ALLYSON C. MYERS (Bar No. 342038)
Ally.Myers@arnoldporter.com
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017-5844
Telephone:     213.243.4000
Facsimile:     213.243.4199

*Attorneys for Plaintiff*
*Samsung Electronics Co., Ltd.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SAMSUNG ELECTRONICS CO., LTD. | Case No. 3:24-CV-03959-LB |
| Plaintiff, | **PLAINTIFF SAMSUNG ELECTRONICS CO., LTD.'S OPPOSITION TO MOTION TO DISMISS** |
| v. | |
| BROADCOM INC., BROADCOM CORPORATION, and AVAGO TECHNOLOGIES INTERNATIONAL SALES PTE. LIMITED, | Date:          December 5, 2024<br>Time:          9:30 a.m.<br>Courtroom: Courtroom B, 15th Floor<br>Before:       Hon. Laurel Beeler |
| Defendants. | **REDACTED VERSION** |

# **TABLE OF CONTENTS**

I.    INTRODUCTION ....................................................................................................... 1

II.   STATEMENT OF ISSUES TO BE DECIDED ....................................................... 2

III.  FACTUAL BACKGROUND ..................................................................................... 3

      A.    The Parties ....................................................................................................... 3

      B.    Relevant Markets and Broadcom's Market Power in those Markets ........................ 3

      C.    Broadcom's Conduct ........................................................................................ 5

      D.    Termination of the Strategic Agreement .......................................................... 7

IV.   ARGUMENT .............................................................................................................. 7

      A.    Samsung's Claims Are Not Time-Barred ......................................................... 7

            1.    Limitations Began To Run When Samsung Was Injured, Not When
                  It Signed The Strategic Agreement In March 2020 ............................. 7

            2.    Even If Limitations Began To Run Outside The Limitations Period,
                  Samsung Can Sue For Injury Within The Limitations Period ............... 9

      B.    Samsung Adequately Alleged Injury-In-Fact And Harm To Competition .............. 11

            1.    Samsung Alleged Injury-In-Fact And Article III Standing .................... 11

            2.    Samsung Alleged Harm To Competition ............................................. 13

      C.    Samsung Alleged Unlawful Exclusive Dealing ............................................. 15

            1.    The Antitrust Laws Reach De Facto Exclusive Dealing ...................... 15

            2.    Broadcom's Agreement To Abandon Its Exclusive Dealing
                  Requirement Under Pressure From Antitrust Enforcers Does Not
                  Immunize Broadcom's Conduct ......................................................... 17

      D.    Samsung Alleged The Substantial Foreclosure Required For Exclusive Dealing ..... 19

            1.    Samsung Alleged Substantial Foreclosure In Proper Relevant
                  Markets ............................................................................................. 19

      E.    Samsung Has Alleged Unlawful Tying .......................................................... 22

            1.    Samsung Alleged Coercion And A *De Facto* Tying Arrangement .............. 22

            2.    Samsung Alleged A Proper Tying Product Market ............................... 24

      F.    Samsung Has Alleged Monopolization And Attempted Monopolization ................. 24

      G.    Samsung Has Alleged Violations Of The Cartwright Act. ................................ 25

H.     If The Court Finds The Complaint Insufficient, Samsung Should Be Permitted To File An Amended Complaint ......................................................................................25

V.     CONCLUSION..........................................................................................................25

1

**TABLE OF AUTHORITIES**

2

**Page(s)**

3

**Cases**

4

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
836 F.3d 1171 (9th Cir. 2016)...................................................................................15, 22

5

6

*Am. Ad Mgmt., Inc. v. GTE Corp.*,
92 F.3d 781 (9th Cir. 1996).................................................................................................13

7

*AMF, Inc. v. General Motors Corp.* (*In re Multidistrict Vehicle Air Pollution*),
591 F.2d 68 (9th Cir. 1979)...............................................................................................10

8

9

*Arcell v. Google LLC*,
No. 5:22-cv-02499-EJD, 2023 WL 5336865 (N.D. Cal. Aug. 18, 2023)...................12

10

11

*Atl. Richfield Co. v. USA Petroleum Co.*,
495 U. S. 328 (1990).............................................................................................................13

12

*In re ATM Fee Antitrust Litig.*,
768 F. Supp. 2d 984 (N.D. Cal. 2009) ............................................................................19

13

14

*Bakay v. Apple Inc.*,
No. 24-cv-00476-RS, 2024 WL 3381034 (N.D. Cal. July 11, 2024) .........................14

15

16

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962).............................................................................................................20

17

18

*Caldera, Inc. v. Microsoft Corp.*,
87 F. Supp. 2d 1244 (D. Utah 1999) ...............................................................................16

19

*Cnty. of Tuolumne v. Sonora Cmty. Hosp.*,
236 F.3d 1148 (9th Cir. 2001)............................................................................................25

20

21

*Columbia Steel Casting Co., Inc. v. Portland Gen. Elec. Co.*,
111 F.3d 1427 (9th Cir. 1996)............................................................................................10

22

23

*CSX Transportation, Inc. v. Norfolk S. Ry. Co.*,
114 F.4th 280 (4th Cir. 2024)..............................................................................................8

24

*Datagate, Inc. v. Hewlett-Packard Co.*,
60 F.3d 1421 (9th Cir. 1995).......................................................................................22, 23

25

26

*DCD Programs, Ltd. v. Leighton*,
833 F.2d 183 (9th Cir. 1987)..............................................................................................25

27

*Don Copeland v. Energizer Holdings, Inc.*,
No. 23-CV-02087-PCP, 2024 WL 511224 (N.D. Cal. Feb. 9, 2024)..........................14

28

OPPOSITION TO MOTION TO DISMISS
CASE NO. 3:24-CV-03959-LB

*Eichmann v. Fotomat Corp.*,
880 F.2d 149 (9th Cir. 1989) ................................................................11

*Eisai Inc. v. Sanofi-Aventis U.S., LLC*,
821 F.3d 394 (3d Cir. 2016) ................................................................19

*Electroglas, Inc. v. Dynatex Corp.*,
497 F. Supp. 97 (N.D. Cal. 1980) ........................................................11

*Feitelson v. Google Inc.*,
80 F. Supp. 3d 1019 (N.D. Cal. 2015) ..................................................14

*FTC v. Motion Picture Adver. Serv. Co.*,
344 U.S. 392 (1953) ............................................................................17

*FTC v. Qualcomm Inc.*,
969 F.3d 974 (9th Cir. 2020) ..........................................................21, 23

*Gerlinger v. Amazon.com Inc.*,
526 F.3d 1253 (9th Cir. 2008) ..............................................................11

*Glen Holly Ent., Inc. v. Tektronix Inc.*,
343 F.3d 1000 (9th Cir. 2003) ..............................................................13

*Global Tel*Link Corp. v. JACS Sols. Inc.*,
708 F. Supp. 3d 784 (E.D. Va. 2023) ..............................................14, 15

*Hennegan v. Pacifico Creative Serv., Inc.*,
787 F.2d 1299 (9th Cir. 1986) ..........................................................9, 10

*Hicks v. PGA Tour, Inc.*,
897 F.3d 1109 (9th Cir. 2018) ..............................................................20

*Hilton v. Children's Hosp. San Diego*,
315 F. App'x 607 (9th Cir. 2008) ..........................................................13

*Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*,
884 F.2d 504 (9th Cir. 1989) ................................................................14

*Maya v. Centex Corp.*,
658 F.3d 1060 (9th Cir. 2011) ..............................................................11

*McWane, Inc. v. FTC*,
783 F.3d 814 (11th Cir. 2015) ..............................................................15

*In re Microsoft Corp. Antitrust Litig.*,
699 F. Supp. 2d 730 (D. Md. 2010) ......................................................16

*Omega Env't, Inc. v. Gilbarco, Inc.*,
127 F.3d 1157 (9th Cir. 1997) ....................................................17, 18, 19

*Pace Industries, Inc. v. Three Phoenix Co.*,
813 F.2d 234 (9th Cir. 1987)..................................................................................8, 10

*Paddock Publ'ns, Inc. v. Chicago Trib. Co.*,
103 F.3d 42 (7th Cir. 1996)...........................................................................................17

*Paladin Assocs., Inc. v. Montana Power Co.*,
328 F.3d 1145 (9th Cir.2003).................................................................................20, 22

*Pistacchio v. Apple Inc.*,
No. 4:20-cv-07034-YGR, 2021 WL 949422 (N.D. Cal. Mar. 11, 2021)....................12

*PNY Techs., Inc. v. SanDisk Corp.*,
No. 11–cv–04689–WHO, 2014 WL 2987322 (N.D. Cal. July 2, 2014).................17, 19

*PNY Techs., Inc. v. SanDisk Corp.*,
No. 11-cv-4689-WHO, 2014 WL 1677521 (N.D. Cal. Apr. 25, 2014) .................14, 19

*Pool Water Prods. v. Olin Corp.*,
258 F.3d 1024 (9th Cir. 2001)......................................................................................13

*Pro Search Plus, LLC v. VFM Leonardo, Inc.*,
No. SACV 12-2102-JST, 2013 WL 3936394 (C.D. Cal. July 30, 2013)....................17

*In re Qualcomm Antitrust Litig.*,
292 F. Supp. 3d 948 (N.D. Cal. 2017) ...............................................6, 12, 23, 24

*Rebel Oil Co. v. Atl. Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995)........................................................................................13

*Reilly v. Apple Inc.*,
578 F. Supp. 3d 1098 (N.D. Cal. 2022) .......................................................................19

*Roland Mach. Co. v. Dresser Indus., Inc.*,
749 F.2d 380 (7th Cir. 1984).........................................................................................17

*Saint Alphonsus Med. Ctr.-Nampa, Inc. v. St. Luke's Health Sys. Ltd.*,
778 F.3d 775 (9th Cir. 2015).........................................................................................20

*Samsung Elecs. Co. v. Panasonic Corp.*,
747 F.3d 1199 (9th Cir. 2014)...................................................................................9, 10

*San Diego Cnty. Gun Rts. Comm., v. Reno*,
98 F.3d 1121 (9th Cir. 1996).........................................................................................11

*Sierra Club v. Morton*,
405 U.S. 727 (1972).......................................................................................................11

*Sonoma Cnty. Ass'n of Retired Emps. v. Sonoma Cnty.*,
708 F.3d 1109 (9th Cir. 2013).......................................................................................25

*Standard Oil Co. v. United States*,
337 U.S. 293, at 295-96, 314-15 (1949) ...............................................................18

*Streamcast Networks, Inc. v. Skype Techs., S.A.*,
547 F. Supp. 2d 1086 (C.D. Cal. 2007)................................................................21

*In re Super Premium Ice Cream Distrib. Antitrust Litig.*,
691 F. Supp. 1262 (N.D. Cal. 1988) ....................................................................21

*Techs. Corp. v. Lubrizol Corp.*,
753 F.3d 594 (6th Cir. 2014)................................................................................11

*Tele Atlas N.V. v. NAVTEQ Corp.*,
No. C-05-01673-RMW, 2008 WL 4809441 (N.D. Cal. Oct. 28, 2008) ...............15, 17

*U.S. v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001) .........................................................................18, 24

*United Shoe Mach. Corp. v. United States*,
258 U.S. 451 (1922) .............................................................................................15

*Ways & Means, Inc. v. IVAC Corp.*,
506 F. Supp. 697 (N.D. Cal. 1979), *aff'd*, 638 F.2d 143 (9th Cir. 1981)....................23

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
401 U.S. 321 (1971)......................................................................................7, 8, 9

*ZF Meritor, LLC v. Eaton Corp.*,
696 F.3d 254 (3d Cir. 2012)................................................................................15

**Statutes**

Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq.* ..................................3, 7, 25

Clayton Act § 3, 15 U.S.C § 14. ..................................................................... *passim*

Clayton Act § 16, 15 U.S.C. § 26 .........................................................................13

Sherman Act § 1, 15 U.S.C. § 1 ...................................................................... *passim*

Sherman Act § 2, 15 U.S.C. § 2 ...................................................................... *passim*

**Other Authorities**

Fed. R. Civ. P. 8(a)..............................................................................................12

Fed. R. Civ. P. 15(a)(2) .......................................................................................25

U.S. Const., Art. III.......................................................................................11, 12

## I.    INTRODUCTION

Broadcom's Motion to Dismiss, Dkt. No. 25 ("Mot."), ignores the well-pled allegations of the Complaint, makes up facts, and misstates the law.  Samsung has more than adequately alleged that Broadcom's egregious conduct violates federal and California antitrust law.

The Complaint describes how Samsung was coerced to sign the Strategic Agreement after Broadcom's shutdown of component shipments put Samsung's multi-billion dollar cell phone business a week away from shutdown.  Yet the very agreement that Broadcom itself called a "bomb drop" that was "beyond business ethics" is transformed in Broadcom's telling into an arm's-length agreement that was the "product of negotiations between two sophisticated companies."  Compl. ¶ 69; Mot. at 1, 5.  That characterization is contrary to the factual assertions of the Complaint, which explain in detail why the agreement was the product of severe coercion.  The Strategic Agreement harmed the competitive process by protecting Broadcom from competition, forcing Samsung to pay Broadcom's inflated prices rather than the cheaper prices offered by Broadcom's competitors, and threating the viability of competition in multiple well-defined markets.  That is exactly the type of harm prohibited by Federal and California antitrust law.

With regard to Broadcom's specific arguments, the complaint is not barred by the statute of limitations.  Samsung sued within four years of first suffering injury.  The Strategic Agreement did not come into force until January 1, 2021, less than four years before Samsung filed this lawsuit. Compl. ¶ 76.  Samsung did not suffer injury when it signed the Strategic Agreement under duress in March of 2020, and its claims did not accrue at that time.  Samsung's injury is paying higher prices, not writer's cramp from signing the agreement, and Samsung does not allege that it paid higher prices as a result of the Strategic Agreement more than four years before filing the Complaint.  *See* Part IV.A, *infra*.

Broadcom next contends that the short duration of the Strategic Agreement insulates it from antitrust scrutiny.  But in fact, the term of the agreement was three years.  The only reason it remained in effect for a shorter period is that Broadcom agreed to terminate the agreement in the face of antitrust investigations of its legality by the European Commission and Korea Fair Trade Commission.  While courts have often (*not always*) found an exclusive dealing agreement with a term of less than a year

1  lawful, Broadcom points to no case in which a three-year agreement terminated early in the face of
2  legal challenges is treated as a short-term agreement that does not raise antitrust concerns.
3  Broadcom's argument would mean that the more anticompetitive an agreement is – and therefore
4  the more quickly it is successfully challenged by government enforcers – the less likely it is to be
5  found unlawful in private litigation.  The early termination of the agreement may reduce the
6  damages Samsung can recover but it does not transform a long-term agreement into a presumptively
7  lawful short-term agreement.  *See* Part IV.C, *infra*.

8     The antitrust laws famously protect "competition not competitors." Broadcom ignores that
9  fundamental concept by arguing that its competitors have not been injured enough to support claims
10  by Samsung – a customer in the relevant market.  But it is beyond dispute that conduct that forces
11  customers to pay higher prices because they have lost the benefits of competition between suppliers
12  is precisely the conduct targeted by the antitrust laws.  Because the Complaint specifically describes
13  how Broadcom's conduct forced Samsung to pay higher prices, Samsung has stated a claim for
14  violation of the antitrust laws.  *See* Part IV.B, *infra*.

15     Broadcom also challenges the Complaint's definition of several markets for specialized
16  semiconductors.  This is a quintessentially factual issue that cannot be decided on a motion to
17  dismiss.  Contrary to Broadcom's arguments, Samsung has not improperly defined markets based
18  on the qualities of the customer as opposed to the product; it has not defined single brand markets;
19  and it has not alleged facially implausible markets.  *See* Part IV.D, *infra*.

20     Finally, Samsung has alleged all of the elements of a tying arrangement, all of the elements
21  of a monopolization claim, and proper claims under California law.  *See* Part IV.E-G, *infra*.

22  **II. STATEMENT OF ISSUES TO BE DECIDED**

23     1. Whether Samsung's claims are timely under the applicable four-year statutes of
24  limitations governing its federal and state antitrust claims because Samsung alleges that it first
25  suffered injury less than four years before filing suit.

26     2. Whether Samsung has stated a claim for exclusive dealing under Section 3 of the
27  Clayton Act, 15 U.S.C. § 14, and Section 1 of the Sherman Act, 15 U.S.C. § 1 because it has
28  adequately alleged that the Strategic Agreement operates as a de facto exclusive dealing agreement

and because that agreement has in fact harmed competition by forcing Samsung to pay higher prices than would have prevailed in a competitive market.

3.    Whether Samsung has stated a tying claim under Section 1 of the Sherman Act, 15 U.S.C. § 1, because it has adequately alleged that the Strategic Agreement operates as a de facto tying agreement that forced Samsung to buy components from Broadcom that it would have preferred to purchase from Broadcom's competitors as a condition of buying the parts it did prefer to source from Broadcom.

4.    Whether Samsung has stated monopolization and attempted monopolization claims under Section 2 of the Sherman Act, 15 U.S.C. § 2, because Samsung has adequately alleged proper product and geographic markets, Broadcom's monopoly power or dangerous probability of obtaining monopoly power in those markets, and anticompetitive conduct by Broadcom.

5.    Whether Samsung has adequately alleged a violation of California's Cartwright Act, Cal. Bus. & Prof. Code §§ 16720, 16727, based on the tying and exclusive dealing conduct that underlies its federal antitrust claims.

## III.    FACTUAL BACKGROUND

### A.    The Parties

Plaintiff Samsung is a Korean multinational electronics company and is one of the largest global manufacturers of mobile phones and other connected devices like tablets and ear buds. Compl. ¶ 17.  Defendant Broadcom, Inc. is an American semiconductor company that sells a wide variety of semiconductor products for the wireless and broadband communications industries, including connectivity and navigation components used in smartphones.  *Id.* ¶ 18.  Broadcom, Inc. has acted through its controlled subsidiaries including Defendant Broadcom Corporation and Defendant Avago Technologies International Sales PTE Limited.  *Id.*  Defendants are collectively identified as "Broadcom."

### B.    Relevant Markets and Broadcom's Market Power in those Markets

During the time period relevant to the Complaint, Samsung sourced several types of components for use in its mobile phones and other connected devices.  These products include three important types of chips used in the smartphones made by Samsung and others: (1) Bluetooth/Wi-

OPPOSITION TO MOTION TO DISMISS
CASE NO. 3:24-CV-03959-LB

Fi (BT/Wi-Fi) chips that are used to provide connectivity via Bluetooth (used to connect to headphones, speakers, and cars) and Wi-Fi (used for Internet connectivity), (2) Global Navigation Satellite System/Global Positioning System ("GNSS/GPS") chips that are used to provide location services, and (3) radio frequency front end ("RFFE") chips called an OMH LPAMiD, single modules that integrate a mid-high frequency amplifier/duplexer and are used to connect to the cellular network. *Id.* ¶¶ 25, 27. The Complaint refers to these three types of components as the "Critical Components." *Id.* ¶ 2.

While the components that Samsung sources from Broadcom were customized in certain respects for Samsung, *id.* ¶ 71, the Complaint does not limit the defined relevant markets to Broadcom's customized chips sold to Samsung, but includes all chips that offer similar functionality sold by Broadcom and competing vendors for use in smartphones, including chips sold to Apple and other customers. *Id.* ¶¶ 5, 45, 51, 53-56, 59. However, the relevant markets are limited to devices sold for use in smartphones, as chips designed for other types of applications (such as GNSS/GPS used in cars or BT/Wi-Fi chips used in personal computers) have different power requirements, different sizes, and other different characteristics that mean that they are not reasonably interchangeable with components designed for smartphones. *Id.* ¶¶ 32, 37.

As described in the Complaint, there exist properly-defined antitrust relevant markets for each of these products. *Id.* ¶¶ 27-41.

- While low-end phones may use Bluetooth and Wi-Fi functionality integrated in a phone's application processor ("AP"), high-end phones like those sold by Samsung and Apple use standalone BT/Wi-Fi chips because they provide superior functionality (including support for the latest and fastest Bluetooth and Wi-Fi standards), even though using a standalone chip imposes added cost. *Id.* ¶¶ 29-30. Because of these critical differences in functionality, customers like Samsung that seek to purchase standalone BT/Wi-Fi chips would not switch to other products (whether APs with integrated functionality or separate BT and Wi-Fi chips) in response to a small but significant non-transitory increase in the price (a "SSNIP") of such chip. *Id.* ¶¶ 30-31.

- Where a phone's processor does not include integrated GNSS/GPS functionality, the phone-maker needs a standalone GNSS/GPS chip to provide the required functionality. *Id.* ¶ 34. Customers that require such functionality would not switch to an AP with integrated functionality in response to a SSNIP of GNSS/GPS chips. *Id.* ¶ 35.

- Single-module chips that provide the functionality of an LPAMiD (an "OMH LPAMiD) are not reasonably interchangeable with separate chips that offer the various functions of an OMH LPAMiD and customers like Samsung would not switch to separate chips in response to a SSNIP given the increased size and reduced performance of using separate chips. *Id.* ¶¶ 38-41.

The relevant geographic market for each of these components is worldwide because the parts are manufactured in various countries and sold worldwide at the same price, excluding shipping costs and customs duties, which are insignificant. *Id.* ¶ 26. In each of these global markets Broadcom had a share of at least 70% during the relevant time period. *Id.* ¶ 42.

### C.     Broadcom's Conduct

For twenty years, Samsung purchased the Critical Components from Broadcom without any written contract, let alone a contract that required exclusivity or any type of minimum purchase. *Id.* ¶¶ 4, 93.[1] However, when Broadcom became aware that Samsung was starting to source some of its requirements for the Critical Components from Broadcom's competitors, Broadcom CEO Hock Tan personally directed that all shipments of the Critical Components be halted, and Broadcom executives made clear that shipments would not be restarted until Samsung agreed to exclusively source the Critical Components from Broadcom. *Id.* ¶¶ 60-68. Broadcom's internal documents

---

[1] Broadcom's summary of the facts strays beyond the allegations of the Complaint and facts of which the Court may properly take judicial notice, including in its assertions (nowhere found in the Complaint) that volume commitments are "common in the industry" and "required for manufacturers to undertake the significant investments" to make components (Mot. at 5). That is belied by the fact that, as Samsung alleges, since 2001 all of Samsung's purchases from Broadcom had been on a purchase order basis, without any written contract, and Broadcom had never required an exclusivity or minimum purchase commitment. Compl. ¶¶ 4, 93.

referred to this strategy as a "nuclear option" and "bomb drop" that was "beyond business ethics." *Id.* ¶ 69.  This was a playbook that Broadcom had pursued in the past, with the U.S. Federal Trade Commission challenging Broadcom's "cutting off all supply" to makers of cable TV set-top boxes that used chips from Broadcom's competitors.  *Id.* ¶ 13 (quoting Complaint ¶ 40, *In re Broadcom Inc.*, Docket No. C-4750 (filed June 29, 2021), *available at* https://tinyurl.com/FTCBroadcom).  The European Commission ("EC") found Broadcom's conduct involving chips for set-top boxes so egregious that it imposed "interim measures" (essentially a preliminary injunction while the EC was investigating) for the first time in twenty years.  Compl. ¶ 15.  *See Antitrust: Commission imposes interim measures on Broadcom*, EC (Oct. 15, 2019), *available at* https://tinyurl.com/BroadcomEC.

While Samsung repeatedly tried to convince Broadcom to restart shipments by offering Broadcom something less than complete exclusivity, Compl. ¶¶ 65-71, upon instructions from CEO Hock Tan, Broadcom refused to restart shipments without a commitment of complete exclusivity on the Critical Components.  *Id.*  The situation became critical for Samsung, and at one point Samsung was within one week of being forced to shut down production of its Z-Flip and Note 10 smartphones, and within two weeks of shutting down production on its newly-launched S-20 smartphone.  *Id.* ¶ 75.  As a result, Samsung was forced in March 2020 to sign a "Strategic Agreement" effective January 2021 that required Samsung to purchase an annual minimum volume per year of the Critical Components that exceeded Samsung's actual requirements for those components, meaning that the volume commitment operated as a de facto 100 percent exclusive dealing agreement with Broadcom.  *Id.* ¶¶ 77-78.  Combined with similar agreements that Broadcom has with Apple by which Apple exclusively purchases components from Broadcom, Broadcom's exclusives with Apple and Samsung locked up more than 70% of the demand for the Critical Components.  *Id.* ¶¶ 82-83, 86.  The agreement also functioned as a de facto tying agreement by forcing Samsung to purchase OMH LPAMiD modules from Broadcom that it would have preferred to buy from Broadcom's competitors as a condition of getting BT/Wi-Fi and GNSS/GPS chips from Broadcom.  *Id.* ¶ 80.

As a result of Broadcom's conduct, Broadcom's rivals were unable to compete for Samsung's business and Samsung was prevented from buying Critical Components from

Broadcom's competitors that would have been less expensive than purchasing from Broadcom. *Id.* ¶¶ 87, 97.

### D.    Termination of the Strategic Agreement

After signing the Strategic Agreement under duress, Samsung tried repeatedly without success to convince Broadcom to waive or relax the agreement's onerous provisions. *Id.* ¶ 88. However, in 2021 Broadcom became aware that both the EC and the Korea Fair Trade Commission ("KFTC") were investigating the conduct challenged in Samsung's Complaint. *Id.* ¶ 89.  In an attempt to head off enforcement actions and fines, in late June 2021 Broadcom informed Samsung that its CEO Hock Tan had agreed to terminate the Strategic Agreement, which was in fact terminated effective as of July 2, 2021. *Id.* ¶ 90.

Despite Broadcom's voluntary termination, the KFTC proceeded with its investigation and concluded that Broadcom had violated Korean antitrust law, imposing a fine of KRW 18.664 billion on Broadcom in October 2023. *Id.* ¶ 11.

## IV.    ARGUMENT

### A.    Samsung's Claims Are Not Time-Barred

#### 1.    Limitations Began To Run When Samsung Was Injured, Not When It Signed The Strategic Agreement In March 2020

Samsung's claims are not barred by the four-year statutes of limitations of the Sherman Act, Clayton Act, and Cartwright Act, 15 U.S.C § 15b, Cal. Bus. & Prof. Code § 16750.1, because its claims did not accrue when it signed the Strategic Agreement in March of 2020.  Broadcom cites no case holding that a plaintiff is injured by the mere act of signing an agreement, and there is no such case.  And there is certainly no case holding that signing an agreement that by its terms is not yet effective is sufficient to start the running of the statute of limitations.  Rather, the law is clear that a claim does not accrue until "a plaintiff feels the adverse impact of an antitrust conspiracy." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971).  The Complaint does not allege that Samsung "fe[lt] the adverse impact" of the Strategic Agreement immediately upon signing, and any such effect would be implausible given that the agreement was by its terms effective only in January 2021, which is within the limitations period.  As should be evident, the

1  adverse impact occurred when Samsung purchased components from Broadcom at inflated prices
2  even though alternatives were available from Broadcom's competitors. "'A purchaser . . .  is not
3  harmed until the monopolist actually exercises its illicit power to extract an excessive price.'" *CSX*
4  *Transportation, Inc. v. Norfolk S. Ry. Co.*, 114 F.4th 280, 290 (4th Cir. 2024) (quoting *Berkey Photo,*
5  *Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 295 (2d Cir. 1979)).   All of those purchases – and the
6  excessive purchases that Samsung was forced to make (Compl. ¶ 98) – occurred within the four
7  years prior to filing of the complaint.

8        Broadcom's reliance on *Pace Industries, Inc. v. Three Phoenix Co*., 813 F.2d 234, 237 (9th
9  Cir. 1987), for the proposition that limitations begins to run "from the commission of the act" is
10 misplaced and based upon an incomplete quotation.   *Pace Industries* actually held, citing the
11 Supreme Court's decision in *Zenith*, that "[a] cause of action in antitrust accrues each time a plaintiff
12 is injured by an act of the defendant and the statute of limitations runs from the commission of the
13 act." *Id.* (citing *Zenith*, 401 U.S. at 338).  The relevant "act" triggering the statute of limitations is
14 the one that injures a plaintiff, not signing a contract that could injure the plaintiff in the future.
15 Indeed, in *Pace Industries* the Ninth Circuit held that the statute of limitations began to run not when
16 Pace signed a contract for the sale of assets that contained a covenant not to compete, but with "the
17 attempted enforcement of an illegal contract through judicial process." *Id.*  Here Samsung was not
18 injured until it paid inflated prices when it would have preferred to buy at lower prices from
19 Broadcom's competitors.  Compl. ¶ 87.  Samsung's purchases and Broadcom's efforts to enforce
20 the Strategic Agreement, *id*. ¶ 88, all happened within the limitations period.

21       Broadcom argues that the Strategic Agreement's effective date of January 1, 2021, which is
22 within the limitations period, is not the start of the limitations period because the Strategic
23 Agreement was an "irrevocable, immutable, permanent and final decision" and because "all of its
24 terms were finalized and permanent at the time of the contract's execution" in March of 2020.  Mot.
25 at 12 (citing *AMF, Inc. v. General Motors Corp.* (*In re Multidistrict Vehicle Air Pollution*), 591 F.2d
26 68, 72 (9th Cir. 1979)).  This is not what the Complaint alleges and is in fact false.

27       First, the Complaint alleges that Samsung repeatedly engaged with Broadcom to modify or
28 terminate the Strategic Agreement and that Broadcom repeatedly rebuffed those attempts, Compl.

¶ 88, agreeing to terminate the agreement "only when it became clear that it would face scrutiny from antitrust enforcers around the globe." *Id.* ¶ 90. There was nothing "immutable" or "permanent" about the agreement in 2020, outside the limitations period, as shown by what actually happened. *See Hennegan v. Pacifico Creative Serv., Inc.*, 787 F.2d 1299, 1301 (9th Cir. 1986) (statute of limitations did not bar claims because "[t]he alleged actions outside the limitations period did not immediately and permanently destroy the Hennegans' business, nor were they 'irrevocable, immutable, permanent and final.'") (quoting *AMF*, 591 F.2d at 72).

Second, Broadcom is simply wrong that the "all of [the Strategic Agreement's] terms were finalized" when the agreement was signed in March 2020. Mot. at 12. As a review of the Strategic Agreement attached as Exhibit 1 to Broadcom's Motion shows, ████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████[2] Samsung could not have been injured, let alone "immutably" injured, by an agreement that at the time of signing did not identify the components that Samsung was required to purchase or the prices for those components.

## 2.    Even If Limitations Began To Run Outside The Limitations Period, Samsung Can Sue For Injury Within The Limitations Period

An exception to the antitrust laws' four-year statute of limitations applies in the case of "continuing violations." *Zenith*, 401 U.S. at 338. Under this doctrine, a plaintiff can recover damages suffered in the four years preceding the filing of the complaint, even if damage commenced earlier. The doctrine applies whenever the defendant commits overt acts within the limitations period that are "new and independent" and that "inflict[] new and accumulating injury." *Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1202-03 (9th Cir. 2014).

Here Samsung suffered the "new and accumulating injury" within the limitations period each time it was forced to purchase exclusively from Broadcom (exclusive dealing) and forced to

---

[2] In fact, Samsung and Broadcom did not mutually agree on the list of Target Components until July 1, 2020, the last permissible day. That date is exactly four years before Samsung filed suit.

buy components from Broadcom that it would have preferred to purchase elsewhere as a condition of buying the components it did want to buy from Broadcom (tying).  As the Ninth Circuit recognized in *Samsung v. Panasonic*, "an action taken under a pre-limitations contract was sufficient to restart the statute of limitations so long as the defendant had the ability not to take the challenged action, even if that would have required breaching the allegedly anti-competitive contract." *Samsung*, 747 F.3d at 1203.  There limitations was restarted because Panasonic chose to enforce anticompetitive license restrictions, even though it could have chosen not to do so.  *Id.* at 1204 ("Like the agreement among the tour operators in *Hennegan* and among the power companies in *Columbia Steel,* the license itself did not permanently and finally control the acts of the SD Defendants. Their decision to enforce the contract caused a new anti-competitive harm, and the statute of limitations ran anew from the time that defendants began enforcement.").  Here, in the same way, limitations is restarted each time Broadcom forced Samsung to buy components it did not want by choosing to enforce the Strategic Agreement.

Each act of enforcing the Strategic Agreement was an overt act that restarted limitations, regardless of when the Strategic Agreement was executed.  For example, in *Pace*, filing a lawsuit to enforce a contract executed outside the limitations period was an overt act that restarted limitations.  812 F. 2d at 239.  In *Hennegan v. Pacifico Creative Service, I*nc., 787 F. 2d 1299 (9th Cir.1986), the Ninth Circuit held that a new cause of action accrued each time a consumer was steered away from the plaintiff's shop, even though the agreement that was the cause of the conduct was executed outside the limitations period.  In *Columbia Steel Casting Co., Inc. v. Portland Gen. Elec. Co.,* 111 F.3d 1427, 1444-45 (9th Cir. 1996), anticompetitive conduct pursuant to a contract executed 18 years earlier was sufficient to restart limitations.

Most cases that refuse to find a continuing violation are, like *AMF*, cases involving a refusal to deal that was final and permanent.  *See Pace Indus.,* 813 F.2d at 237 ("Most of our discussion of continuing violations and last overt acts arises in refusal to deal cases.").  But this case involves a challenge to exclusive dealing and tying, not to a refusal to deal, and different principles apply.  *See Samsung*, 747 F.3d at 1203 ("*AMF* is the exception, not the rule.").  In *AMF,* a refusal to deal was "irrevocable" and "permanent" because of "the unique nature of the automobile business."  591 F.2d

1  at 72.  Here, in contrast, there was nothing "irrevocable and permanent" about Broadcom requiring

2  exclusive dealing and forcing Samsung to buy unwanted components via a tying arrangement.

3        The cases cited by Broadcom are readily distinguishable.  In *Eichmann v. Fotomat Corp.*,

4  880 F.2d 149, 160 (9th Cir. 1989), the defendant did nothing more than passively receive lease

5  payments established by a pre-limitations contract.  Here, of course, the pre-limitations contract did

6  not even set the prices Samsung would pay, *supra* at 9, and Broadcom actively rebuffed Samsung's

7  efforts to renegotiate or terminate the Strategic Agreement within the limitations period.  Compl.

8  ¶ 88.  *Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594 (6th Cir. 2014), was a challenge to an

9  acquisition outside the limitations period, and the court held that price increases after an acquisition

10  were not overt acts sufficient to restart limitations.  Unlike a pre-limitations acquisition, Broadcom's

11  enforcement of the Strategic Agreement and setting the prices for components within the limitations

12  period are overt acts.  *Electroglas, Inc. v. Dynatex Corp.*, 497 F. Supp. 97, 106 (N.D. Cal. 1980),

13  involved a tying arrangement in which a plaintiff wished to buy blades but was also forced to

14  purchase a saw.  But the purchase of the saw (the tied product) occurred outside the limitations

15  period, *id.* at 104, and the court held that continuing to make installment payments on the saw within

16  the limitations period did not restart limitations because "[t]he rights and liabilities of the parties

17  were finalized by the contracts executed in March 1974, which fixed the price and payment schedule

18  for the saw." *Id.* at 106.  Again, those are not the facts here, where the Strategic Agreement did not

19  set the prices that would be paid within the limitations period, and Broadcom did not merely

20  passively receive the benefits of its pre-limitations agreement.

21        **B.   Samsung Adequately Alleged Injury-In-Fact And Harm To Competition**

22            **1.   Samsung Alleged Injury-In-Fact And Article III Standing**

23        Broadcom's argument that Samsung has not alleged injury-in-fact or Article III standing is

24  frivolous.  Samsung alleges that it paid higher prices.  Compl. ¶ 87.  "For Article III purposes, an

25  antitrust plaintiff establishes injury-in-fact when he has suffered an injury which bears a causal

26  connection to the alleged antitrust violation."  *Gerlinger v. Amazon.com Inc.*, 526 F.3d 1253, 1255

27  (9th Cir. 2008) (cleaned up).  Paying an overcharge "is a quintessential injury-in-fact." *Maya v.

28  Centex Corp.*, 658 F.3d 1060, 1069 (9th Cir. 2011).  *See generally Sierra Club v. Morton*, 405 U.S.

727, 733-34 (1972) ("palpable economic injuries have long been recognized as sufficient to lay the basis for standing"); *San Diego Cnty. Gun Rts. Comm., v. Reno*, 98 F.3d 1121, 1130 (9th Cir. 1996) ("Economic injury is clearly a sufficient basis for standing."); *In re Qualcomm Antitrust Litig.*, 292 F. Supp. 3d 948, 973 (N.D. Cal. 2017) ("Plaintiffs have sufficiently pled injury-in-fact" where the complaint contained a "non-speculative assertion that Qualcomm's exclusive dealing with Apple resulted in higher prices for handsets.").

The Federal Rules require only a "short and plain statement" alleging that Samsung "is entitled to relief," Fed. R. Civ. P. 8(a), and to allege injury-in-fact, Samsung is not required to allege the specific prices that it paid Broadcom and the prices it would have paid others but-for Broadcom's anticompetitive conduct. But Broadcom knows that Samsung is fully capable of doing so. Indeed, the KFTC's decision finding that Broadcom violated Korean antitrust law identifies specific purchases from Broadcom and the specific prices that Samsung would have paid alternative suppliers.

The cases cited by Broadcom do not require dismissal here. *Pistacchio v. Apple Inc*., No. 4:20-cv-07034-YGR, 2021 WL 949422 (N.D. Cal. Mar. 11, 2021), does not discuss Article III standing and dismissed the claims on other grounds. *Id.* at *3. While the court noted that "[a] further additional problem is antitrust damage," that was because plaintiff failed to explain how he was damaged given his ability to purchase from Apple's competitors. *Id.* at *2. That is not the case here; Samsung's complaint clearly explains how the minimum purchase requirement imposed by Broadcom made it impossible for Samsung to purchase from Broadcom's competitors because "[p]aying twice for the same component – paying Broadcom's competitor for the component and paying Broadcom under the 'take or pay' – was not economically viable given Samsung's need to minimize its costs in order to compete in the exceptionally competitive markets in which it sells its Flagship Devices." Compl. ¶ 8. *Arcell v. Google LLC*, No. 5:22-cv-02499-EJD, 2023 WL 5336865 (N.D. Cal. Aug. 18, 2023), is likewise distinguishable. There the court held plaintiffs failed to allege how they could have been overcharged for using Google's search engine "because search engines are free." *Id.* at *5. Broadcom did not provide Samsung with components "free," and Samsung's Complaint clearly explains how it was overcharged.

OPPOSITION TO MOTION TO DISMISS
CASE NO. 3:24-CV-03959-LB

1

### 2.    Samsung Alleged Harm To Competition

2      Broadcom is deeply confused about the requirement that an antitrust plaintiff allege harm

3   to competition in order to establish the antitrust injury required to state an antitrust claim.  *See Glen*

4   *Holly Ent., Inc. v. Tektronix Inc.*, 343 F.3d 1000, 1008 (9th Cir. 2003).  It is axiomatic that "[t]he

5   antitrust laws were enacted for the 'protection of *competition*, not *competitors*." *Atl. Richfield Co.*

6   *v. USA Petroleum Co.*, 495 U. S. 328, 338 (1990) (citing *Brown Shoe Co. v. United States*, 370 U.S.

7   294, 320 (1962)).  Broadcom's argument here seems to be that its competitors were not harmed

8   *enough* by its anticompetitive conduct, because they were able to compete for Samsung's business

9   before the challenged conduct and "competitors were fully able to pick up Samsung's business

10  following termination of the Strategic Agreement."  Mot. at 15-16.  But harm to competition does

11  not require that Broadcom's competitors be permanently crippled.  If that were the case no antitrust

12  plaintiff could sue until it was too late to restore competition, and that is plainly not the law given

13  that the Clayton Act permits private suits to prevent "threatened loss or damage by a violation of

14  the antitrust laws."  Clayton Act § 16, 15 U.S.C. § 26.

15      Nor is Samsung complaining of an injury from too much competition.  Samsung alleges that

16  as a consumer it was forced to pay more because of a reduction in competition.  Harm to a consumer

17  from a reduction is competition is the quintessential case of harm to competition.  *See Rebel Oil Co.*

18  *v. Atl. Richfield Co.*, 51 F.3d 1421, 1446 (9th Cir. 1995) ("Like the Sherman Act, the original

19  Clayton Act's primary aim was to prevent harm to consumers.").  Here Broadcom's conduct

20  insulated Broadcom from competition with other firms that would have offered Samsung better

21  prices, forcing Samsung to pay Broadcom's overcharges.  This constitutes harm to competition

22  because "[i]t is difficult to image a more typical example of anti-competitive effect than higher

23  prices." *Am. Ad Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781, 791 (9th Cir. 1996).  Likewise, the injury

24  Samsung complains of – being forced to pay higher prices as a result of Broadcom's

25  anticompetitive acts – is antitrust injury.  *See Hilton v. Children's Hosp. San Diego*, 315 F. App'x

26  607, 609 (9th Cir. 2008) ("antitrust injury focuses on whether [the plaintiff] has produced evidence

27  that the defendants' acts . . . raised the price of services above competitive levels in the relevant

28  market"); *Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1034 (9th Cir. 2001) (antitrust laws are

1   "concerned with acts that harm allocative efficiency and raise the price of goods above their

2   competitive level or diminish their quality") (cleaned up); *Les Shockley Racing, Inc. v. Nat'l Hot*

3   *Rod Ass'n*, 884 F.2d 504, 508 (9th Cir. 1989) (harm to competition is shown by "actual detrimental

4   competitive effects such as output decreases or price increases"); *Don Copeland v. Energizer*

5   *Holdings, Inc.,* No. 23-CV-02087-PCP, 2024 WL 511224, at *9 (N.D. Cal. Feb. 9, 2024) ("direct

6   evidence of anticompetitive effects—the price increases discussed above—are sufficient to establish

7   harm to competition").

8          The cases Broadcom relies on, Mot. at 15-16, are distinguishable because none involved

9   adequate allegations that the defendant's conduct had forced its customers to pay higher prices.  In

10  *PNY Techs., Inc. v. SanDisk Corp.*, No. 11-cv-4689-WHO, 2014 WL 1677521 (N.D. Cal. 2014),

11  the plaintiff was a competitor, not a consumer, and the court rejected "[t]hreadbare" allegations that

12  non-party consumers had paid higher prices.  *Id.* at *3.  Here Samsung (the consumer) has alleged

13  exactly how it was forced to pay higher prices.  In *Bakay v. Apple Inc.*, No. 24-cv-00476-RS, 2024

14  WL 3381034, at *3–5 (N.D. Cal. July 11, 2024), the court rejected standing because the plaintiffs'

15  claims of harm were too "indirect," with "eight steps" between the defendants' misconduct and the

16  plaintiffs' injury.  Broadcom does not even argue that Samsung's injury is indirect here.  Similarly,

17  in *Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019 (N.D. Cal. 2015), the court found the injury too

18  indirect to support standing because "Plaintiffs elide allegations concerning the number of supply

19  chain levels between OEMs who sign the allegedly anticompetitive MADAs and end consumers

20  like Plaintiffs."  *Id.* at 1028.  There are no intermediate steps between Broadcom's anticompetitive

21  conduct and the overcharges that Samsung paid Broadcom.

22         The facts of *Global Tel*Link Corp. v. JACS Sols. Inc.*, 708 F. Supp. 3d 784 (E.D. Va. 2023),

23  have no relationship to the facts here.  There the plaintiff supplier agreed to an exclusive dealing

24  agreement with its customer and then challenged that agreement because it could not sell to its

25  customer's competitors.  That claim failed because the supplier alleged only that "the challenged

26  exclusive dealing provision has hindered [its] ability to compete vigorously for customers in the

27  market."  *Id.* at 797 (cleaned up).  But even if the plaintiff's foreclosure from the market led to

28  higher prices, the plaintiff was not complaining about antitrust injury because "this injury is plainly

1    not suffered by [plaintiff] itself." *Id.* The court did not doubt that the customers that paid higher

2    prices would have suffered antitrust injury, even if the plaintiff did not. *Id.* at 798 ("If that is true,

3    the correctional tablet market suffered an antitrust injury. But JACS, critically, does not allege that

4    JACS' injury flows from the alleged harm to the market."). Here, of course, Samsung is

5    complaining about higher prices that *it* paid, not that were paid by others. That is antitrust injury

6    under *Global Tel\*Link Corp.*

7          C.    **Samsung Alleged Unlawful Exclusive Dealing**

8                1.    **The Antitrust Laws Reach De Facto Exclusive Dealing**

9          Broadcom argues that the Strategic Agreement is lawful because it did not expressly require

10   Samsung to give Broadcom 100% of its business. That is irrelevant; it has been clear for more than

11   one hundred years what matters is not the existence of the word "exclusive" in a contract, but

12   whether the agreement's terms have the "practical effect" of preventing customers from giving

13   business to the supplier's rivals. *See United Shoe Mach. Corp. v. United States*, 258 U.S. 451, 457

14   (1922) ("While the clauses enjoined do not contain specific agreements not to use the machinery of

15   a competitor of the lessor, the practical effect of these drastic provisions is to prevent such use. We

16   can entertain no doubt that such provisions as were enjoined are embraced in the broad terms of the

17   Clayton Act, which cover all conditions, agreements, or understandings of this nature."); *accord*

18   *Tele Atlas N.V. v. NAVTEQ Corp.*, No. C-05-01673-RMW, 2008 WL 4809441, at \*20 (N.D. Cal.

19   Oct. 28, 2008) ("The Supreme Court has emphasized that whether a contract creates an exclusive

20   dealing arrangement depends on the contract's 'practical effect' and its 'practical application.'")

21   (quoting and citing *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961)).

22          Such agreements are sometimes called "de facto exclusive dealing," and the law treats them

23   no differently than an agreement that expressly requires exclusivity. "[U]nder a 'de facto' exclusive

24   dealing theory . . . we look past the terms of the contract to ascertain the relationship between the

25   parties and the effect of the agreement in the real world." *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,

26   836 F.3d 1171, 1182 (9th Cir. 2016) (cleaned up); *accord ZF Meritor, LLC v. Eaton Corp.*, 696

27   F.3d 254, 282 n.14 (3d Cir. 2012) (an "exclusive dealing claim does not require a contract that

28   imposes an express exclusivity obligation"); *McWane, Inc. v. FTC*, 783 F.3d 814, 833-35 (11th Cir.

2015) (rejecting "formalistic distinctions" between exclusive dealing contracts and exclusive programs). A requirement that customers purchase a minimum quantity can operate as a de facto exclusive dealing program. *See, e.g.*, *In re Microsoft Corp. Antitrust Litig.*, 699 F. Supp. 2d 730, 742, 752 (D. Md. 2010) (analyzing "as essentially an allegation of exclusive dealing" agreements in which "Microsoft forced OEMs to sign contracts with minimum purchase commitments that substantially exceeded a realistic expectation by the OEM"). That is exactly what happened here and what the Complaint alleges.

The Complaint describes how Broadcom demanded that Samsung stop dealing with Broadcom's competitors. *See, e.g.*, Compl. ¶ 62 ("Broadcom made clear that it was issuing a simple ultimatum: Samsung must use components sourced from Broadcom, and not Broadcom's competitors."), ¶ 66 ("On February 28, 2020, Broadcom rejected that offer, and reiterated that it would not resume responding to POs until Samsung signed a three-year exclusive agreement (covering 2021-2023) committing to de facto total exclusivity with regard to all the Critical Components, not just OMH and BT/Wi-Fi chips."), ¶ 70 ("On March 9 and March 13, under duress from Broadcom's termination of shipments, Samsung made Broadcom offers committing to exclusivity for certain Critical Components for Flagship Devices but leaving Samsung some freedom to source other Critical Components from alternate suppliers. Broadcom rejected both proposals."). The end result was, as alleged in the Complaint, an agreement that gave Broadcom de facto exclusivity. "Because the Annual Commitment exceeded Samsung's requirements of each of the Critical Components, the Annual Commitment operated as a de facto 100 percent exclusive agreement with Broadcom." *Id.* ¶ 78.

This is just like the situation in *Caldera, Inc. v. Microsoft Corp.*, 87 F. Supp. 2d 1244 (D. Utah 1999), where Microsoft required personal computer OEMs "to pay [it] a royalty on every machine the OEM shipped regardless of whether the machine contained MS DOS or another operating system." *Id.* at 1249-50. This meant that OEMs had to pay twice if they wanted to use a product from Microsoft's competitors, an effect the court recognized as having "the practical effect of exclusivity," as it imposed a "tax" when an OEM did business with Microsoft's competitors. *Id.* at 1250.

1    Because the Complaint alleges that both Broadcom and Samsung understood that the intent

2    and effect of the Strategic Agreement was to require exclusivity, that is enough to state a *de facto*

3    exclusive dealing claim. *See, e.g.*, *Tele Atlas*, 2008 WL 4809441, at *21 (finding exclusive dealing

4    arrangement where "[t]he license with Ford and its affiliates does not appear exclusive on its face,

5    but the evidence provided by Tele Atlas suggests that the NAVTEQ believed the contract was

6    exclusive and that Ford treated it that way.").

7          **2.**    **Broadcom's Agreement To Abandon Its Exclusive Dealing Requirement**

8                      **Under Pressure From Antitrust Enforcers Does Not Immunize**

9                      **Broadcom's Conduct**

10    While cases often note that short-term or easily-terminable exclusive dealing agreements are

11    presumptively lawful, *e.g.*, *Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1163-64 (9th Cir.

12    1997), those cases are of no assistance to Broadcom here.  First, the Strategic Agreement had a

13    three-year term, Compl. ¶ 77, and ███████████████████████████████████.

14    Motion, Exhibit 1.[3]  Second, even if there were a "presumption," that presumption is rebutted by

15    the facts alleged showing that the agreement had actual anticompetitive effects.

16    None of the cases cited by Broadcom support finding an agreement with a three-year term

17    and no early termination provision presumptively lawful.  *See Omega Env't*, 127 F.3d at 1163 n.6

18    (one year contract terminable on 60 days' notice); *PNY Techs., Inc. v. SanDisk Corp.*, No. 11–cv–

19    04689–WHO, 2014 WL 2987322, at *4 (N.D. Cal. July 2, 2014) ("The facts demonstrated that

20    SanDisk's contracts are also easily terminable, none requiring more than 45–days' notice to

21    cancel."); *Pro Search Plus, LLC v. VFM Leonardo, Inc.*, No. SACV 12-2102-JST (ANx), 2013 WL

22    3936394, at *4 (C.D. Cal. July 30, 2013) (four contracts terminable on 10-90 days' notice and one

23    contract terminable on 12 months' notice); *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380,

24    395 (7th Cir. 1984) (agreement "terminable in 90 days"); *FTC v. Motion Picture Adver. Serv. Co.*,

25    344 U.S. 392 (1953) (five year agreements unlawful, upholding FTC order limiting term to one

26    year); *Paddock Publ'ns, Inc. v. Chicago Trib. Co.*, 103 F.3d 42, 44 (7th Cir. 1996) ("All of the

27

28       [3] The fact that the agreement could be terminated by mutual consent of the parties does not mean that it was easily terminable, because every agreement can be terminated by mutual consent.

contracts between services and newspapers are terminable at will or on short notice (usually 30 days, although some features require a year's notice).").

It would be a bizarre result to hold that a long-term exclusive agreement so egregious that the defendant was forced by antitrust enforcers' scrutiny to terminate it thereby becomes immunized from antitrust claims. Nor is there any rule that plaintiffs suing to challenge long-term exclusive dealing claims are required to wait a year before suing on the off chance that the agreement will be terminated. Furthermore, Samsung has challenged Broadcom's exclusive dealing under Section 2 of the Sherman Act (in addition to Section 1 of the Sherman Act and Section 3 of the Clayton Act), and under Section 2 conduct by a monopolist is unlawful if it is "is reasonably capable of contributing significantly to a defendant's continued monopoly power." *U.S. v. Microsoft Corp.*, 253 F.3d 34, 79 (D.C. Cir. 2001). Imposition of a three-year exclusive dealing agreement by a monopolist with shares in the relevant markets in excess of 70%, Compl. ¶¶ 45, 51, 56, is certainly "reasonably capable of contributing significantly to a defendant's continued monopoly power" upon imposition, even if the agreement is later terminated under pressure.

In any event, Broadcom's claim, Mot. at 20, that "unanimous precedent hold[s] that contracts of less than a year cannot be unlawfully exclusive *as a matter of law*" is a dramatic mischaracterization of the law. In *Standard Oil Co. v. United States*, the Supreme Court found exclusive dealing agreements unlawful even though they were "terminable at the end of the first 6 months of any contract year, or at the end of any such year, by giving to the other at least 30 days prior thereto written notice." 337 U.S. 293, at 295-96, 314-15 (1949). *Omega Environmental* held (on a summary judgment motion) that short-term and easy terminability of exclusives "negate substantially their potential to foreclose competition," 127 F.3d at 1163, but it did not hold that short-term exclusives were *never* an antitrust concern.

More generally, *Omega Environmental* is of no help to Broadcom for three reasons. First, that case involved exclusives with distributors, and the Ninth Circuit recognized that "exclusive dealing arrangements imposed on distributors rather than end-users are generally less cause for anticompetitive concern." 127 F.3d at 1162. This case involves exclusives imposed on Samsung and Apple, which are customers rather than distributors. Second, the Ninth Circuit held that short-

term contracts are usually not a cause for antitrust concern because "a competing manufacturer need only offer a better product or a better deal" to win the business. *Id.* at 1164. Here again, that rationale is inapplicable because Broadcom's exclusive prevented its competitors from winning the business even though they *did* offer a better deal. And finally, and most fundamentally, Samsung's allegation that the exclusive dealing arrangement forced it to pay higher prices is sufficient to overcome any presumption that short-term agreements usually will not harm competition. The Ninth Circuit looked at evidence of "decreasing prices" to hold that a jury could not "reasonably infer probable injury to competition." *Id.* at 1164. Here, in contrast, Samsung has alleged that Broadcom's conduct led to higher prices, not lower prices. Compl. ¶ 87. That is enough to state an exclusive dealing claim. *See Eisai Inc. v. Sanofi-Aventis U.S., LLC*, 821 F.3d 394, 403 (3d Cir. 2016) ("We also analyze the likely or actual anticompetitive effects of the exclusive dealing arrangement, including whether there was reduced output, increased price, or reduced quality in goods or services").[4]

### D.    Samsung Alleged The Substantial Foreclosure Required For Exclusive Dealing

#### 1.    Samsung Alleged Substantial Foreclosure In Proper Relevant Markets

Broadcom's arguments that Samsung has failed to allege the substantial foreclosure required to state an exclusive dealing claim are meritless.

Broadcom begins by claiming that the relevant product markets alleged in the complaint are "implausible single-brand markets." Mot. at 20-21.[5] That is nonsense. A "single-brand" market is, as its name suggests, limited to a "single brand." *See Reilly v. Apple Inc.*, 578 F. Supp. 3d 1098, 1107 (N.D. Cal. 2022) (relevant market limited to Apple's App Store); *In re ATM Fee Antitrust Litig.*, 768 F. Supp. 2d 984, 995 (N.D. Cal. 2009) (plaintiffs alleged "a market consisting only of

---

[4] *PNY v. SanDisk* held that a claim of higher prices was not enough for an exclusive dealing claim to survive a motion to dismiss, but that case is distinguishable. There the court held only that "[i]t is not enough to point to supposed 'direct evidence of competitive harm' that cannot be attributed to the claimed exclusion." 2014 WL 2987322, at *10. Here, however, Samsung alleges that the higher prices it paid are directly attributable to Broadcom using exclusive dealing to prevent Samsung from doing business with Broadcom's lower-priced competitors. That allegation is both plausible and non-conclusory: Samsung knows the prices it paid and the prices offered to it by the foreclosed competitors.

[5] Broadcom does not contest the worldwide geographic market alleged in the Complaint. Compl ¶ 26.

1   transactions routed over Star, but excluding other ATM networks"). But Samsung has not alleged

2   markets limited to Broadcom chips, as is obvious from the fact that Samsung is complaining about

3   the fact that it was unable to purchase from Broadcom's competitors, Compl. ¶¶ 5, 59, and that

4   Samsung alleges that Broadcom has less than a 100% share in each of the markets. *Id.* ¶ 45

5   (Broadcom competes with Qualcomm in the Global Phone Standalone BT/Wi-Fi Chip, but its

6   market share exceeds 85%), ¶ 51 (Broadcom's share of Global Phone Standalone GNSS/GPS Chip

7   Market above 75% and likely above 90%), ¶¶ 53-56 (Broadcom is one of three suppliers in the

8   Global OMH LPAMiD Module Market and its share exceeded 70%).

9       Rather than defining the relevant markets based on the brand of the seller, Samsung has

10  properly defined markets on the basis of reasonable interchangeability and cross-elasticity of

11  demand based on the SSNIP test (which asks whether firms would change products in response to

12  a "small but significant non-transitory increase in price"). Compl. ¶¶ 30-32, 35-36, 40-41; *see*

13  *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1163 (9th Cir.2003) ("For antitrust

14  purposes, a market is composed of products that have reasonable interchangeability for the purposes

15  for which they are produced—price, use and qualities considered.") (cleaned up); *Saint Alphonsus*

16  *Med. Ctr.-Nampa, Inc. v. St. Luke's Health Sys. Ltd.*, 778 F.3d 775, 784 (9th Cir. 2015) (explaining

17  that a common method for determining the relevant geographic market "is to find whether a

18  hypothetical monopolist could impose a small but significant nontransitory increase in price

19  ('SSNIP') in the proposed market") (cleaned up).[6]

20      Broadcom's argument (Mot. at 21-22) that product markets cannot be defined based on the

21  "technological aspects" of products is equally baseless. *See Brown Shoe*, 370 U.S. at 325 (markets

22  defined based upon "the product's peculiar characteristics and uses"). Despite Broadcom's

23  unsupported argument to the contrary, Samsung has not alleged that the markets are limited to chips

24  _____

25  [6] Samsung's allegations look very different from the cases in which complaints have been
    dismissed on the grounds of improper market definition. Compare Compl. ¶¶ 29-32, 35-38, 40-41
    (explaining why products with different features are not substitutable or reasonably

26  interchangeable) *with Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1122-23 (9th Cir. 2018) (affirming
    dismissal because alleged market was implausible without explanation of why potential substitutes

27  were not interchangeable).

28

customized to Samsung's specifications; it alleges that Apple also uses Phone Standalone BT/Wi-Fi Chips and OMH LPAMiD chips. *See* Compl. ¶ 28 ("Samsung's high-end Flagship smartphones, like all other high-end smartphones including Apple's iPhone, are built around Phone Standalone BT/Wi-Fi Chips"), ¶ 54 ("Upon information and belief, Apple has also purchased OMH LPAMiD chips from both Broadcom and Qorvo during the relevant time period."). And, as noted above, Samsung has defined the markets based on functionality and cross-elasticity of demand. By alleging that customers would not switch to parts outside the defined markets that offer fewer features (such as not supporting the most recent Wi-Fi standards, *id.* ¶ 29, or inferior GPS accuracy, *id.* ¶ 35) in response to a SSNIP, Samsung has defined proper product markets. Broadcom does not even attempt to argue why products outside the markets alleged are reasonably interchangeable with the products in them.

The cases cited by Broadcom are inapposite. *Streamcast Networks, Inc. v. Skype Techs., S.A.*, 547 F. Supp. 2d 1086, 1095 (C.D. Cal. 2007), involved an improper attempt to limit the relevant market to a single brand's product, ignoring the substitutability of other products and the fact that users would pick those products in the face of price differences. *In re Super Premium Ice Cream Distrib. Antitrust Litig.*, 691 F. Supp. 1262, 1268 (N.D. Cal. 1988), was decided on cross-motions for summary judgment, not at the pleading stage, and found that the relevant product market included all ice cream because "[a]ll grades of ice cream compete for both retail shelf space and for consumers' attention," and plaintiffs had "not presented sufficient facts to create an issue of fact that people who buy so called 'super premium' or 'luxury' ice creams do not buy others which are lower in the spectrum of price or quality." Here, in contrast, Samsung has alleged (and will prove) that products inside its alleged markets are not interchangeable with products outside the markets, and that Samsung and other customers would not substitute products outside the relevant markets in response to a SSNIP. Courts commonly accept market definitions of the type alleged by Samsung. *See, e.g.*, *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020) ("Here, the district court correctly defined the relevant markets as 'the market for CDMA modem chips and the market for premium LTE modem chips.'").

1    Samsung's Complaint alleges that the effect of Broadcom's exclusive agreements with

2    Samsung and Apple was to foreclose Broadcom's competitors from more than 70% of market

3    demand for the components subject to the Strategic Agreement.  Compl. ¶¶ 86, 101, 106.  That is

4    more than enough foreclosure to state an exclusive dealing claim.

5        **E.    Samsung Has Alleged Unlawful Tying**

6            **1.    Samsung Alleged Coercion And A *De Facto* Tying Arrangement**

7        Broadcom argues that Samsung's tying claims fail because the strategic agreement "did not

8    expressly condition" the sale of the tying product (Phone Standalone BT/Wi-Fi Chips and

9    GNSS/GPS Chips) on Samsung's agreement to purchase the tied products (OMH LPAMiD

10   modules.[7]  Mot. at 23.  But the courts have repeatedly recognized that a tying requirement need not

11   be expressly stated to violate the antitrust laws.  In *Aerotec*, 836 F.3d at 1179, the Ninth Circuit

12   recognized that "tying conditions need not be spelled out in express contractual terms to fall within

13   the Sherman Act's prohibitions."  Rather, an unlawful tie would be found when the seller "adopts a

14   policy that makes it unreasonably difficult or costly to buy the tying product . . . without buying the

15   tied product." *Id.* (quoting *Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 272 (6th Cir.

16   2015)).  The key requirement of a tying claim is "coercion," which requires a plaintiff to "present

17   evidence that the defendant went beyond persuasion and coerced or forced its customers to buy the

18   tied product in order to obtain the tying product." *Paladin Assocs.*, 328 F.3d at 1159.  Samsung's

19   Complaint is replete with allegations of the required "coercion," and on no plausible reading of the

20   Complaint did Broadcom engage in mere "persuasion."

21       The facts of *Datagate, Inc. v. Hewlett-Packard Co.*, 60 F.3d 1421 (9th Cir. 1995), are

22   analogous.  There the plaintiff claimed that HP had tied computer hardware service to software

23   service.  The Ninth Circuit reversed summary judgment for the defendant, holding that the evidence

24   showed the coercion required for a tying arrangement where a customer "was interested in

25   purchasing hardware service from a provider other than HP until he learned that HP would refuse

26

27   _____

[7] Broadcom's Motion refers to only BT/Wi-Fi chips as the tying product, Mot. at 23, but Samsung
clearly alleges that both BT/Wi-Fi and GNSS/GPS Chips are tying products. *See* Compl. ¶¶ 110-
28   20 (BT/Wi-Fi chips as tying product), ¶¶ 121-31 (GPS/GNSS chips as the tying product).

1   to provide software service." *Id.* at 1426.   That is what happened here – Samsung wanted to

2   purchase the tied products from Broadcom's competitors until Broadcom cut off sales of the tying

3   products to coerce Samsung to buy the tied products from Broadcom.   Compl. ¶¶ 60-81.   The Ninth

4   Circuit also found proof of coercion based on "the fact that [a competitor's] prices for hardware

5   service were lower than HP's," which "supports the inference that HP's threats to some extent

6   coerced Rockwell into making a purchase from HP it would not have made on the open market."

7   *Datagate*, 60 F. 3d at 1426.   And that is what happened here as well – Samsung was forced to

8   purchase the tied components from Broadcom even though it could have purchased them at a lower

9   price from Broadcom's competitors.   Compl. ¶ 87.

10      Samsung has alleged that purchasing the tying products without the tied products was

11   "commercially unviable."   Compl. ¶ 111 (unviable to buy BT/Wi-Fi chips without LPAMiD

12   modules), ¶ 122 (unviable to buy GNSS/GPS Chips without LPAMiD modules).   This states a tying

13   claim, because courts will find a tying arrangement where the "only viable economic option is to

14   purchase the tying and tied products in a single package." *Ways & Means, Inc. v. IVAC Corp.*, 506

15   F. Supp. 697, 701 (N.D. Cal. 1979), *aff'd*, 638 F.2d 143 (9th Cir. 1981).   *FTC v. Qualcomm* is not

16   to the contrary.   The problem the Ninth Circuit identified in *Qualcomm* was "[t]he district court's

17   consideration of anticompetitive impacts outside of the relevant markets"; it had looked to harm in

18   the "much larger market of cellular services generally," not to harm in the "market for CDMA

19   modem chips and the market for premium LTE modem chips" that were the relevant markets in the

20   complaint.   969 F.3d at 992.   Here, unlike in *Qualcomm*, Samsung points to harm – foreclosure of

21   competitors and higher prices it paid – in the markets alleged in the Complaint.

22      Qualcomm's "no license, no chips" policy at issue in that case is not analogous to

23   Broadcom's conduct here.   The Ninth Circuit held that because "the condition imposed on gaining

24   access to Qualcomm's chip supply applies regardless of whether the OEM chooses Qualcomm or a

25   competitor . . . then the condition by definition does not distort the 'area of effective competition'

26   or impact competitors." *Id.* at 1002.   Qualcomm's policy had the effect of raising prices "regardless

27   of which chip supplier the OEM chooses to source its chips from." *Id.*   That is *not* the effect of

28   Broadcom's conduct.   Samsung would pay once if it bought Broadcom chips and twice if it bought

1    chips from Broadcom's competitors.  Paying more to buy chips from Broadcom's competitors very

2    much does "impact competitors" and "distort competition."  As the Ninth Circuit noted:

> If Qualcomm were to refuse to license its SEPs to OEMs unless they
> first agreed to purchase Qualcomm's chips ("no chips, no license"),
> then rival chip suppliers indeed might have an antitrust claim under
> both §§ 1 and 2 of the Sherman Act based on exclusionary conduct.
> This is because OEMs cannot sell their products *without* obtaining
> Qualcomm's SEP licenses, so a "no chips, no license" policy would
> essentially force OEMs to either purchase Qualcomm's chips or pay
> for *both* Qualcomm's and a competitor's chips (similar to the no-win
> situation faced by OEMs in the *Caldera* case).

8    *Id.* (citing *Caldera*, 87 F. Supp. 2d 1244, discussed *supra* at 16).  That is what happened here.

### 2. Samsung Alleged A Proper Tying Product Market

10    Broadcom argues that Samsung has alleged an improper "single-brand" tying product

11    market.  Mot. at 24.  As discussed above, Samsung has done no such thing, defining tying product

12    markets for BT/Wi-Fi chips and GNSS/GPS chips that are not limited to Broadcom chips and in

13    which other firms compete.  *Supra* at 19-20.  Nor is Samsung's GNSS/GPS Chip market "premised

14    on a contract to which Samsung agreed."  Mot. at 24.  Rather, the GNSS/Chip market is defined on

15    the basis of reasonable interchangeability and cross-elasticity of demand based on the SSNIP test.

16    *Supra* at 20.  And there is nothing wrong with defining a product market based upon the

17    technological functionality of the products in the market.  *Supra* at 20-21.

### F. Samsung Has Alleged Monopolization And Attempted Monopolization

19    Broadcom argues that Samsung's Section 2 claims fail because they are based on the same

20    conduct challenged under Section 1 of the Sherman Act.   Mot. at 24-25.  Because Samsung has

21    alleged proper exclusive dealing and tying claims under Section 1 for the reasons discussed above,

22    it has adequately alleged the anticompetitive conduct required for a claim under Section 2 of the

23    Sherman Act.  Indeed, even exclusive dealing and tying that do not violate Section 1 can violate

24    Section 2.  *U.S. v. Microsoft Corp.*, 253 F.3d at 70 ("we agree with plaintiffs that a monopolist's

25    use of exclusive contracts, in certain circumstances, may give rise to a § 2 violation even though

26    the contracts foreclose less than the roughly 40% or 50% share usually required in order to

27    establish a § 1 violation"); *id.* at 94 (remanding tying claim under § 1 while affirming § 2

28    liability).

24    OPPOSITION TO MOTION TO DISMISS
CASE NO. 3:24-CV-03959-LB

Broadcom also argues, Mot. at 25, that Samsung's Section 2 claims fail because it has not alleged a proper "Phone Standalone BT/Wi-Fi Market." That argument fails for the reasons described above. *Supra* at 19-21.

Notably, Broadcom does not dispute that Samsung has adequately alleged that Broadcom has monopoly power or a dangerous probability of obtaining monopoly power on the basis of its shares exceeding 70% in the relevant markets. Compl. ¶¶ 45, 51, 56.

**G.    Samsung Has Alleged Violations Of The Cartwright Act.**

Broadcom is correct that the analysis under the Cartwright Act is identical to that under the Sherman Act. *Cnty. of Tuolumne v. Sonora Cmty. Hosp*., 236 F.3d 1148, 1160 (9th Cir. 2001). Because Samsung has stated claims under the Sherman Act for the reasons described above, it also states claims under the Cartwright Act.

**H.    If The Court Finds The Complaint Insufficient, Samsung Should Be Permitted To File An Amended Complaint**

For the reasons explained above, the Complaint states a cause of action with regard to all counts and Broadcom's motion should be denied. But should the Court find any claim insufficiently pled, Samsung respectfully requests leave to amend. "The court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). "As a general rule, '[d]ismissal without leave to amend is improper unless it is clear, upon de novo review, that the complaint could not be saved by any amendment.'" *Sonoma Cnty. Ass'n of Retired Emps. v. Sonoma Cnty.*, 708 F.3d 1109, 1118 (9th Cir. 2013) (quoting *Polich v. Burlington N., Inc.*, 942 F.2d 1467, 1472 (9th Cir. 1991)). And while leave to amend may be denied where there would be prejudice to the opposing party, "[t]he party opposing amendment bears the burden of showing prejudice." *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 187 (9th Cir. 1987). Broadcom has made no attempt to make such a showing.

**V.    CONCLUSION**

Samsung's Complaint alleges that Broadcom has engaged in exclusive dealing and tying in violation of Sections 1 and 2 of the Sherman Act and of the Cartwright Act. Broadcom's Motion to Dismiss should be denied.

1

2    Dated: October 11, 2024                    ARNOLD & PORTER KAYE SCHOLER LLP

3

4                                    By:  */s/ Douglas A. Winthrop*
                                         Douglas A. Winthrop
5                                        Daniel B. Asimow
                                         Jonathan I. Gleklen (*admitted pro hac vice*)
6                                        Jeenie Kahng
                                         Allyson C. Myers
7                                        *Attorneys for Plaintiff*
                                         *Samsung Electronics Co., Ltd.*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28