LATHAM & WATKINS LLP
Christopher S. Yates (Cal. Bar No. 161273)
 *chris.yates@lw.com*
Belinda S Lee (Cal. Bar No. 199635)
 *belinda.lee@lw.com*
Aaron T. Chiu (Cal. Bar No. 287788)
 *aaron.chiu@lw.com*
505 Montgomery Street, Suite 2000
San Francisco, California 94111
Telephone: +1.415.391.0600

LATHAM & WATKINS LLP
Sean M. Berkowitz (*pro hac vice*)
 *sean.berkowitz@lw.com*
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone: +1.312.876.7700

*Attorneys for Defendants Broadcom Inc., Broadcom Corporation and Avago Technologies International Sales Pte. Limited*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SAMSUNG ELECTRONICS CO., LTD.,<br><br>Plaintiff,<br><br>v.<br><br>BROADCOM INC., BROADCOM CORPORATION, AND AVAGO TECHNOLOGIES INTERNATIONAL SALES PTE. LIMITED,<br><br>Defendants. | CASE NO. 3:24-cv-03959-LB<br><br>**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS**<br><br>Date:        December 5, 2024<br>Time:        9:30 a.m.<br>Courtroom:  Courtroom B, 15th Floor<br>Before:      Hon. Laurel Beeler |

**REDACTED VERSION**

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................. 1

II.  ARGUMENT ....................................................................................................... 2

    A.   Samsung's Claims Are Foreclosed by the Antitrust Statute of Limitations ................................................................................................. 2

        1.   Samsung's Claims Accrued and the Statute of Limitations Began Running When It Executed the Strategic Agreement in March 2020 ........................................................................... 2

        2.   Samsung Has Not and Cannot Plead Any Overt Acts by Broadcom to Invoke the Continuing Violations Exception ..................... 3

    B.   Samsung's Claims Fail Because It Cannot Plead Injury-in-Fact or Any Harm to Competition ........................................................................... 5

        1.   Samsung's Conclusory Allegations of "Higher Prices" Do Not Establish the Requisite Injury-in-Fact for Article III Standing ....................................................................................... 5

        2.   Samsung's Allegations of Higher Prices Without Harm to Competition Precludes Antitrust Injury ........................................ 7

    C.   Samsung Fails to Plead Any Unlawful Exclusive Dealing .................................. 9

        1.   The Strategic Agreement's Six-Month Duration, Coupled with the Admissions that Samsung Was Not Precluded from Securing Alternate Supply, Precludes Any Claim of Exclusive Dealing ................................................................... 9

        2.   Samsung's Foreclosure Shares Rest on Improper Product Markets ...................................................................................... 11

    D.   Samsung Fails to Plead a Tying Agreement ...................................................... 13

        1.   The Strategic Agreement's Minimum Purchase Requirement Is Not an Unlawful Tying Arrangement, "De Facto" or Otherwise ......................................................... 13

        2.   Samsung's Tying Claims Fail Because It Has Not Alleged a Cognizable Tying Product Market or Market Power ..................... 15

    E.   Samsung's Monopolization and California Cartwright Act Claims Fail ................................................................................................. 15

III. CONCLUSION................................................................................................... 15

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

## CASES

4

*Aerotec International, Inc. v. Honeywell International, Inc.*,
   836 F.3d 1171 (9th Cir. 2016) ............................................................. 10

5

*Airweld, Inc. v. Airco, Inc.*,
6  742 F.2d 1184 (9th Cir. 1984) ............................................................. 4

7

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP*,
   592 F.3d 991 (9th Cir. 2010) ............................................................... 7

8

*American Ad Management, Inc. v. General Telephone Co. of California*,
9  190 F.3d 1051 (9th Cir. 1999) ............................................................. 7

10

*Apple Inc. v. Psystar Corp.*,
   586 F. Supp 2d 1190 (N.D. Cal. 2008) ........................................... 12, 13

11

*Apple iPod iTunes Antitrust Litigation*,
12  No. C 05-00037, 2009 WL 10678931 (N.D. Cal. May 15, 2009) ............... 13, 14

13

*Aurora Enterprises, Inc. v. National Broadcasting Co.*,
   688 F.2d 689 (9th Cir. 1982) ........................................................... 2, 4

14

*Barry Wright Corp. v. ITT Grinnell Corp.*,
15  724 F.2d 227 (1st Cir. 1983) ............................................................... 9

16

*Centennial School District v. Independent Blue Cross*,
   No. Civ. A. 93-3456, 1994 WL 62016 (E.D. Pa. Feb. 28, 1994) ................. 14

17

*Columbia Steel Casting Co., Inc. v. Portland General Electric Co.*,
18  111 F.3d 1427 (9th Cir. 1996) ............................................................. 5

19

*County of Tuolumne v. Sonora Community Hospital*,
   236 F.3d 1148 (9th Cir. 2001) ............................................................. 15

20

*CSX Transportation, Inc. v. Norfolk Southern Railway Co.*,
21  114 F.4th 280 (4th Cir. 2024) ............................................................. 3

22

*Datagate, Inc. v. Hewlett-Packard Co.*,
   60 F.3d 1421 (9th Cir. 1995) ............................................................. 14

23

*Eichman v. Fotomat Corp.*,
24  880 F.2d 149 (9th Cir. 1993) ............................................................. 4

25

*Federal Trade Commission v. Qualcomm Inc.*,
   969 F.3d 974 (9th Cir. 2020) .......................................................... 9, 11

26

*Feitelson v. Google Inc.*,
27  80 F. Supp. 3d 1019 (N.D. Cal. 2015) ................................................. 7

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iii

DEFS.' REPLY ISO MOT. TO DISMISS
CASE NO. 3:24-CV-03959-LB

*Forsyth v. Humana, Inc.*,
114 F.3d 1467 (9th Cir. 1997) ........................................................................... 12

*Global Tel\*Link Corp. v. JACS Solutions Inc.*,
708 F. Supp. 3d 784 (E.D. Va. 2023) ................................................................... 7

*Grand Rapids Plastics, Inc. v. Lakian*,
188 F.3d 401 (6th Cir. 1999) ............................................................................... 4

*Hennegan v. Pacifico Creative Service, Inc.*,
787 F. 2d 1299 (9th Cir. 1986) ............................................................................ 5

*Hicks v. PGA Tour, Inc.*,
897 F.3d 1109 (9th Cir. 2018) ........................................................................... 13

*In re Super Premium Ice Cream Distribution Antitrust Litigation*,
691 F. Supp. 1262 (N.D. Cal. 1988) .................................................................. 13

*Innovative Health LLC v. Biosense Webster, Inc.*,
19-cv-1984, 2022 WL 1599713 (C.D. Cal. Mar. 22, 2022) ............................... 12

*Lucas Automotive Engineering., Inc. v. Bridgestone/Firestone, Inc.*,
140 F.3d 1228 (9th Cir. 1998) .............................................................................. 6

*Omega Environmental, Inc. v. Gilbarco, Inc.*,
127 F.3d 1157 (9th Cir. 1997) ......................................................................... 9, 12

*Pace Industries, Inc. v. Three Phoenix Co.*,
813 F.2d 234 (9th Cir. 1987) ............................................................................ 3, 5

*Paladin Associates, Inc. v. Montana Power Co.*,
328 F.3d 1145 (9th Cir. 2003) ........................................................................... 15

*PNY Technologies, Inc. v. SanDisk Corp.*,
No. 11-cv-4689, 2014 WL 2987322 (N.D. Cal. July 2, 2014) ............... 7, 8, 9, 15

*Power Analytics Corp. v. Operation Technology, Inc.*,
No. SA CV16-1955, 2018 WL 10231437 (C.D. Cal. July 24, 2018), *aff'd*, 820
F. App'x 1005 (Fed. Cir. 2020) ....................................................................... 7, 9

*Prime Healthcare Services, Inc. v. Service Empployees International Union*,
642 F. App'x 665 (9th Cir. 2016) ......................................................................... 6

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
124 F.3d 430 (3d Cir. 1997) .............................................................................. 12

*Samsung Electronics Co. v. Panasonic Corp.*,
747 F.3d 1199 (9th Cir. 2014) .............................................................................. 4

*StreamCast Networks, Inc. v. Skype Technologies, S.A.*,
547 F. Supp. 2d 1086 (C.D. Cal. 2007) ............................................................. 13

*Thurman Industries, Inc. v. Pay 'N Pak Stores, Inc.*,
875 F.2d 1369 (9th Cir. 1989) ........................................................................... 12

*US Airways, Inc. v. Sabre Holdings Corp.*,
   938 F.3d 43 (2d Cir. 2019)................................................................................................. 2, 4

*Varner v. Peterson Farms*,
   371 F.3d 1011 (8th Cir. 2004) ......................................................................................... 3, 4

*Ways & Means, Inc. v. IVAC Corp.*,
   506 F. Supp. 697 (N.D. Cal. 1979) .................................................................................... 14

*Western Parcel Express v. United Parcel Service of America, Inc.*,
   65 F. Supp. 2d 1052 (N.D. Cal. 1998), *aff'd*, 190 F.3d 974 (9th Cir. 1999) ..................... 7, 8

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
   401 U.S. 321 (1971)............................................................................................................ 3

## I.    INTRODUCTION

Samsung's opposition fails to grapple with the reality that this case involves a supplier agreement executed beyond the applicable statute of limitations, that lasted for merely six months, and admittedly had no meaningful impact on Samsung's ability to source components from other suppliers—which means it could not have harmed competition.  Stripped of its hyperbolic characterizations and misdirection on the law, all Samsung is left to complain of are the very contractual commitments to which it agreed in the Strategic Agreement.  Its claims are not only stale, but not actionable under the antitrust laws.

To try to salvage its untimely claims, Samsung ignores the case law holding that in the context of alleged exclusive dealing or tying contracts, any claim accrues and the statute of limitations begins to run when the contract is executed—which occurred here in March 2020, well outside the four-year limitations period.  Samsung instead relies on cases involving continuing conspiracies (which have no bearing here), and those where antitrust defendants affirmatively took acts to *enforce* an anticompetitive contract.  Here, the only things that happened after the execution of the Strategic Agreement (and before Broadcom and Samsung agreed to its termination) were Samsung's purchases of components pursuant to its terms, which the law makes clear are merely manifestations of the agreement itself, and not new overt acts that restart the limitations period.

As for its failure to plead injury-in-fact to establish Article III standing or the requisite harm to competition for antitrust standing, the sum and substance of Samsung's response is to merely reiterate that it paid "higher prices" for components under the Strategic Agreement.  That is not enough to plead a non-conclusory injury-in-fact independent of the contractual commitments it agreed to.  Nor is it enough to plead harm to competition, particularly against Samsung's admissions that before, during and after the six-month term of the Strategic Agreement, it successfully sourced components from Broadcom's competitors.  *E.g.*, Compl. ¶¶ 45, 54, 75.

Samsung further misdirects by contending that what matters for its exclusive dealing claim is that Broadcom was supposedly "pressured" by antitrust authorities to terminate it.  But what matters is whether there was an actual effect on competition.  Here, there could be none given that the agreement was in effect for just six months and did not foreclose any of Broadcom's

competitors from reaching customers, including Samsung.  Samsung's refusal to confront what is dispositive when it comes to exclusive dealing speaks volumes.

With respect to its tying claim, Samsung continues to focus on the inconsequential, quibbling with whether the Strategic Agreement could amount to a *de facto* tying arrangement, even though the contract by its terms did not condition the sale of any specific components upon Samsung's purchase of another, and Samsung's admission that it *was* able to, and in fact *did*, buy the tied product—OMH LPAMiD modules—from other suppliers during the agreement.  *Id.* ¶ 54.

Samsung does not dispute that its monopolization and Cartwright Act claims rise and fall with its exclusive dealing and tying claims, so those claims fail as well.  Absent any timely or actionable claims, Samsung's Complaint should be dismissed with prejudice.

## II.    ARGUMENT

### A.    Samsung's Claims Are Foreclosed by the Antitrust Statute of Limitations

1.    Samsung's Claims Accrued and the Statute of Limitations Began Running When It Executed the Strategic Agreement in March 2020

To avoid the reality that its antitrust claims accrued in March 2020 when the parties executed the Strategic Agreement, and are thus time-barred, Samsung misrepresents the law in suggesting that there is "no such case" "holding that a plaintiff is injured by the mere act of signing an agreement."  Opp'n at 7.  In case after case involving challenges to contracts as unlawfully exclusive or as tying arrangements, courts in this circuit and others hold that such claims accrue and the statute of limitations begins to run when the contract is executed.  *See, e.g.*, *Aurora Enters., Inc. v. Nat'l Broad. Co.*, 688 F.2d 689, 694 (9th Cir. 1982) ("[T]he mere fact that defendants receive a benefit today as a result of a contract *executed* in 1966 . . . is not enough to restart the statute of limitations." (emphasis added)); *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 68–69 (2d Cir. 2019) ("[E]ach supracompetitive price charged to [the plaintiff] by [the defendant] pursuant to the 2006 contract was not an overt act of its own, but a manifestation of the prior overt act of *entering into the 2006 contract*.  That act . . . began the running of the statute of limitations[.]" (emphasis added)).  This is because the contract's execution is what establishes the rights and obligations challenged as unlawful, and is thus the act that "injures" the plaintiff and triggers the statute of limitations.  *See Varner v. Peterson Farms*, 371 F.3d 1011, 1020 (8th Cir.

2004) ("[W]hen a complaining party was fully aware of the terms of an agreement when it *entered into the agreement*, an injury occurs only when the agreement *is initially imposed*." (emphasis added)).

If anything, it is Samsung that fails to offer authority that the statute of limitations does not begin to run until subsequent obligations under the allegedly anticompetitive contract arise. Samsung's references to *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321 (1971) and *CSX Transportation, Inc. v. Norfolk S. Ry. Co.*, 114 F.4th 280 (4th Cir. 2024), are misplaced. Both cases involved conspiracies—not antitrust challenges to contracts—and so the assessment of whether those conspiracies' continuing maintenance of inflated prices or lock-out of competition were acts triggering the statute of limitations have no bearing here. Samsung's invocation of *Pace Industries, Inc. v. Three Phoenix Co.*, 813 F.2d 234 (9th Cir. 1987) is similarly misplaced. There, the Ninth Circuit did not even address whether any claims accrued with the signing of a contract. Rather, the issue was whether "prosecution of a contract enforcement suit is a single overt act or a continuing antitrust violation"; the Court concluded that "it is a single overt act." *Id.* at 239.

Samsung's remaining arguments are unavailing. Allegations that "Samsung repeatedly engaged with Broadcom to modify or terminate the Strategic Agreement and that Broadcom repeatedly rebuffed those attempts," Opp'n at 8 (citing Compl. ¶ 88), do not bear on when Samsung's claims accrued. And while Samsung points to determinations regarding purchase quantities and amounts—those requirements were established upon execution of the Strategic Agreement. Samsung's claims accrued when it executed the Strategic Agreement in March of 2020 and are time-barred under the four-year antitrust statute of limitations.

2.    Samsung Has Not and Cannot Plead Any Overt Acts by Broadcom to Invoke the Continuing Violations Exception

Samsung tries to invoke the continuing violations exception by mischaracterizing allegations reflecting mere performance under the Strategic Agreement (and Broadcom's corresponding receipt of benefits) as overt acts by Broadcom to "enforce" the agreement. Samsung contends that it suffered a "new and accumulating injury" "each time it was forced to purchase exclusively from Broadcom . . . and forced to buy components from Broadcom that it would have

preferred to purchase elsewhere[.]" Opp'n at 9–10. But subsequent purchases of components by Samsung did not result from further acts by Broadcom; they were the natural consequences of the Strategic Agreement. And the fact that prices and quantities and were set throughout the term of the agreement does not make those purchases "overt acts." Samsung's complaint is that all its purchases under the Strategic Agreement were at undesirable prices because the minimum purchase requirement "made it impossible for Samsung to purchase from Broadcom's competitors[.]" Opp'n at 12 (citing Compl. ¶ 8). Those purchases were only "manifestation[s]" of that prior agreement and not any "new and independent act" that restarted the limitations period. *See US Airways*, 938 F.3d at 68–69 ("each supracompetitive price charged . . . [under] the contract was not an overt act of its own" but a continuation of the initial decision to enter into the . . . contract); *Airweld, Inc. v. Airco, Inc.*, 742 F.2d 1184, 1190 (9th Cir. 1984) (a purchaser's "voluntary conduct" pursuant to a contract to buy separate tied products is not "active enforcement of an illegal contract"); *Varner*, 371 F.3d at 1019–20 ("Performance of the alleged anticompetitive contracts during the limitations period is not sufficient to restart the period." (citations omitted)).[1]

Samsung's attempt to analogize this case to those where defendants actually took actions to enforce a contract that restarted the limitations period also fail. In *Samsung Electronics Co. v. Panasonic Corp.*, 747 F.3d 1199, 1202–04 (9th Cir. 2014), the Ninth Circuit held that the defendants, contributors to a patent pool that licensed standards-essential patents for SD memory cards, engaged in a new and overt act when they sought to have Samsung adopt a new patent license covering second-generation SD Cards. The Court held that even though the royalty rate under the license was the same as for prior generation SD Cards, the defendants' attempt to enforce the new patent license agreement on Samsung was an overt act, because the old license "did not contemplate future expansion, nor did it foreclose future agreements on different terms." *Id.* at 1204. *Samsung v. Panasonic* is of no help to Samsung here, where the claimed "enforcement" by Broadcom did not involve attempts to enter into a new agreement, or expand or extend the Strategic

---

[1] *See also Eichman v. Fotomat Corp.*, 880 F.2d 149, 160 (9th Cir. 1993) (the "passive receipt of profits" from an allegedly illegal contract was not an "overt act of enforcement which . . . restart[ed] [the] statute of limitations"); *Aurora Enterprises*, 688 F.2d at 694 (active enforcement of an illegal contract may restart the statute of limitations, but mere receipt of benefits does not); *Grand Rapids Plastics, Inc. v. Lakian*, 188 F.3d 401, 406 (6th Cir. 1999).

Agreement, but rather accepting payments from Samsung for products shipped during its term.

Samsung's reliance on *Pace Industries* is similarly flawed. The "enforcement" in *Pace* that constituted an overt act was the defendant's initiation of a lawsuit to enforce a contract. 813 F.2d at 237. Here, all Samsung contends Broadcom did to "enforce" the Strategic Agreement was refuse to modify or terminate it on certain occasions. Opp'n at 8. That inaction is not the type of enforcement found in *Pace* sufficient to restart the limitations period.

Samsung also cannot rely on cases in which courts found repeated acts in furtherance of an anticompetitive conspiracy sufficient to start the limitations period anew. *Hennegan v. Pacifico Creative Service, Inc*., 787 F. 2d 1299 (9th Cir. 1986), involved a conspiracy where tour operators agreed to shepherd tourists to certain souvenir vendors in exchange for unlawful payments. The Ninth Circuit held that the shepherding of tourists to vendors who were part of the conspiracy were overt acts undertaken in furtherance of the conspiracy and therefore not beyond the statute of limitations. *Id.* at 1300–02. *Columbia Steel Casting Co., Inc. v. Portland Gen. Elec. Co.,* 111 F.3d 1427, 1444–45 (9th Cir. 1996) involved a market-division conspiracy among electrical utilities where one utility's refusal to transmit another utility's electricity to the plaintiff's industrial plant was an overt in furtherance of the conspiracy. *Id.* In both cases, the overt acts were not mere consequences of a pre-limitations act, but rather acts undertaken by co-conspirators that *furthered* the unlawful conspiracy. They do not lend anything to situations involving contracts like here, where the "acts" identified are merely performance obligations required under the contract itself.

Everything Samsung identifies as a supposed "overt act"—the purchases made and prices paid by Samsung for components and Broadcom's refusal to "renegotiate or terminate the Strategic Agreement within the limitations period," Opp'n at 11, are just manifestations of the pre-limitations agreement that do not restart the limitations period. "Any other holding would destroy the function of the statute, since parties may continue indefinitely to receive some benefit as a result of an illegal act performed in the distant past." *Aurora Enterprises*, 688 F.2d at 694.

**B.    Samsung's Claims Fail Because It Cannot Plead Injury-in-Fact or Any Harm to Competition**

1.    <u>Samsung's Conclusory Allegations of "Higher Prices" Do Not Establish the Requisite Injury-in-Fact for Article III Standing</u>

1    Samsung's main response to whether it adequately pleads injury-in-fact is to reiterate that

2    it "paid higher prices" under the terms of the Strategic Agreement and say, in a circular fashion,

3    that it is sufficient.  Opp'n at 11.  That, however, does not solve Samsung's failure to allege any

4    concrete injury beyond the fact that it was subject to the Strategic Agreement.  In an antitrust case,

5    a plaintiff must have "suffered an injury which bears a causal connection to the alleged antitrust

6    violation." *Lucas Auto. Eng'g., Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1232 (9th Cir.

7    1998).  Merely claiming that prices were "higher," absent allegations connecting those prices to

8    anticompetitive conduct or a lessening in competition, does not suffice.  *See Prime Healthcare*

9    *Servs., Inc. v. Serv. Emps. Int'l Union*, 642 F. App'x 665, 666–67 (9th Cir. 2016) (affirming

10   dismissal as "[c]onclusory 'allegations that an agreement has the effect of . . . increasing prices to

11   consumers do not sufficiently allege an injury to competition.'" (cleaned up)).

12   The reason Samsung focuses so much on its conclusory allegations of "higher prices" is

13   because it needs the Court to ignore the non-conclusory allegations reflecting (the reality) that the

14   Strategic Agreement, effective for only six months, did not preclude Samsung from securing other

15   sources of supply at its preferred prices.  Samsung admits that it multi-sourced components in

16   2019, Compl. ¶¶ 5, 59, bought from Qorvo before and during the Strategic Agreement, *id.* ¶¶ 54,

17   60, 85, and, after the agreement's termination, immediately sourced chips from Qualcomm, *id.*

18   ¶ 45.  This all contradicts the conclusory claims of "higher prices" and that the "minimum purchase

19   requirement . . . made it impossible for Samsung to purchase from Broadcom's competitors."

20   Opp'n at 12.  Samsung also ignores that the Strategic Agreement could not force it to take "higher"

21   prices given a ████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████

23   ████████████████████████████████████    ECF No. 25-2 §§ B, E.  Against these

24   contradictions, the conclusory allegations that the agreement "resulted in . . . higher prices,"

25   Compl. ¶¶ 10, 87, fails to establish injury-in-fact.  Samsung lacks Article III standing.[2]

26

27   [2] Samsung's reference to the Korea Fair Trade Commission investigation does not supplant
     Samsung's burden of alleging injury-in-fact.  *See, e.g.*, *In re Capacitors Antitrust Litig.*, 106 F.
28   Supp. 3d 1051, 1064 (N.D. Cal. 2015) (government investigations by foreign authorities "carry no
     weight" as to whether plaintiffs alleged plausible claims for relief).

2.    <u>Samsung's Allegations of Higher Prices Without Harm to Competition Precludes Antitrust Injury</u>

Samsung's pleading deficiencies similarly preclude it from establishing an antitrust injury. Antitrust injury requires more than a conclusory allegation that a plaintiff was injured by "higher prices." Rather, an "antitrust injury . . . [must] 'flow[] from that which makes defendants' acts unlawful" under the antitrust laws, *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1056 (9th Cir. 1999), and must be "the type of injury the antitrust laws were designed to prevent"— which is "an injury to *competition*." *W. Parcel Exp. v. United Parcel Serv. of Am., Inc.*, 65 F. Supp. 2d 1052, 1064 (N.D. Cal. 1998), *aff'd*, 190 F.3d 974 (9th Cir. 1999) (emphasis added). It is this issue that separates contractual injury and *antitrust* injury. *See Glob. Tel*Link Corp. v. JACS Sols. Inc.*, 708 F. Supp. 3d 784, 796 (E.D. Va. 2023) (plaintiff lacked antitrust standing where injury was "not dependent on the existence of an antitrust violation" but flowed from contractual obligations). Where the "antitrust plaintiff 'would have suffered an identical loss' if the contract were not unlawful," the plaintiff's claim lies in contract, not antitrust. *Id.* (citations omitted).

Against these principles, Samsung's pleading deficiencies are glaring. Its singular focus on "higher prices" circumvents the core inquiry underlying antitrust injury—whether Broadcom's alleged conduct foreclosed competition among fellow suppliers. *See Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 (9th Cir. 2010) ("[A]n exclusive dealing arrangement violates Section 1 [of the Sherman Act] only if its effect is to foreclose competition in a substantial share of the line of commerce affected."); *Power Analytics Corp. v. Operation Tech., Inc.*, No. SA CV16-1955, 2018 WL 10231437, at *18 (C.D. Cal. July 24, 2018), *aff'd*, 820 F. App'x 1005 (Fed. Cir. 2020) ("The 'ultimate question' in an exclusive dealing case is whether the defendant's conduct harmed competition." (simplified)); *PNY Techs., Inc. v. SanDisk Corp.*, No. 11-cv-4689, 2014 WL 2987322, at *10 (N.D. Cal. July 2, 2014) (dismissing an exclusive dealing claim for failure to plead "substantial foreclosure of competition"); *Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1030 (N.D. Cal. 2015) (exclusive dealing is actionable "only if its effect is to foreclose competition in a substantial share of the line of commerce affected" (simplified)).

This is the exact pleading defect identified in *PNY v. SanDisk*, where plaintiff (also

represented by Samsung's counsel) argued that defendant's alleged exclusive dealing harmed competition "in the form of supra-competitive prices." 2014 WL 2987322, at *10 n.17. The court rejected the plaintiff's attempt to plead antitrust injury solely on higher prices, as "the existence of supra-competitive prices does not, in itself, suggest foreclosure." *Id.* Rather, "[t]here could be any number of reasons to explain why . . . prices . . . may have stayed steady or risen, but needless to say, the mere fact that exclusive arrangements with [defendant] were in place at the time does not indicate causality." *Id.* Yet assuming causality is precisely what Samsung asks the Court to do. By merely pointing to the bare allegation that it paid "higher prices," Samsung assumes harm to competition and a viable antitrust injury. *PNY*, however, instructs that such a threadbare allegation is insufficient.

Further, any attempt by Samsung to allege that the higher prices resulted from a harm to competition is precluded by its own admissions that competition was *not foreclosed.* Samsung admits that it continued to successfully source from Broadcom's competitors before, during, and after the Strategic Agreement, and that any difficulties it had multi-sourcing was due to external factors unrelated to the Strategic Agreement—namely, that a primary barrier to for other suppliers is that "[d]evelopment of [BT/WiFi, GNSS/GPS, and OMH LPAMiD] chips takes years and costs millions of dollars and requires difficult to obtain technological expertise." Compl. ¶¶ 46, 52, 57.

Take *Western Parcel Express v. UPS* for example. There, a competitor claimed that UPS unlawfully required shippers to ship via UPS regionally, and the court reasoned that "[i]n order for the [agreements] to be illegal restraints, [plaintiff] must show that the probable effect of the [agreements] is to foreclose competition in a substantial portion of the market." 65 F. Supp. 2d at 1064. The court concluded that UPS's shipper agreements were not "in fact exclusive," as "none of the contracts contain[ed] terms requiring a customer to give all of its shipping business to UPS." *Id.* at 1065. While the contracts "require[d] . . . certain levels of volume in order to receive agreed pricing discounts" and made UPS the preferred carrier, those terms were "not a *requirement* that the customer can use only UPS." *Id.* (emphasis in original). Nothing prevented competitors from "obtain[ing] one of UPS's customers by offering better prices or services," and so the requisite harm to competition did not exist. *Id.* The Strategic Agreement similarly was not by its terms

exclusive and Samsung admittedly sourced from Broadcom's competitors before, during, and after the agreement.  Samsung has not pled the requisite harm to competition.  *See Power Analytics*, 2018 WL 10231437, at \*22; *PNY*, 2014 WL 2987322, at \*4.

**C.     Samsung Fails to Plead Any Unlawful Exclusive Dealing**

1.     <u>The Strategic Agreement's Six-Month Duration, Coupled with the Admissions that Samsung Was Not Precluded from Securing Alternate Supply, Precludes Any Claim of Exclusive Dealing</u>

Samsung badly misconstrues Broadcom's argument regarding the failure to plead an unlawful exclusive deal as premised on the notion that "because [the Strategic Agreement] did not expressly require Samsung to give Broadcom 100% of its business," it was not exclusive.  Opp'n at 15.  In quibbling with whether *de facto* exclusive dealing is actionable under the antitrust laws, Samsung distracts from the dispositive issue dooming its exclusive dealing claims:  whether the Strategic Agreement had the *effect* of "foreclosing competition in a substantial share of the line of commerce affected."  *FTC v. Qualcomm Inc.*, 969 F.3d 974, 1003 (9th Cir. 2020) (simplified).  It is this effect on *competition*—specifically, those "opportunities for other traders to enter into or remain in that market," *id.*—that distinguishes contracts merely limiting the buying opportunities of one customer from those contracts that unlawfully foreclose competition among competing sellers.  *See also id.* ("The competition foreclosed by the contract must be found to constitute a substantial share of the relevant market . . . that is to say, the opportunities for other traders to enter into or remain in that market must be significantly limited.").  "[V]irtually every contract to buy 'forecloses' or 'excludes' alternative sellers from some portion of the market, namely the portion consisting of what was bought."  *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 236 (1st Cir. 1983).  But that itself is not enough, because "[t]he main antitrust objection to exclusive dealing is its tendency to 'foreclose' existing competitors or new entrants from competition in the covered portion of the relevant market during the term of the agreement."  *Omega Envt'l, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997) (simplified).

Here, Samsung acknowledges that competition for the provision of the chips and components Samsung wanted to source existed before, during, and after the Strategic Agreement. Compl. ¶¶ 45, 75.  Samsung admits that "during the relevant time period, [it] purchased OMH

1    LPAMiD Modules from both Broadcom and Qorvo," *id.* ¶ 54, and that "Qualcomm has recently

2    launched a phone standalone BT/Wi-Fi chip in competition with Broadcom and Samsung and

3    recently begun sourcing BT/Wi-Fi chips from Qualcomm," *id.* ¶ 45.  Samsung also does not (and

4    cannot) allege that any of Broadcom's competitors went out of business, had their capabilities

5    materially diminished, or experienced financial hardship due to the Strategic Agreement.

6            Samsung offers no answer for how its allegations, which confirm the absence of any effect

7    of the Strategic Agreement on competition, do not doom its exclusive dealing claims.  Samsung

8    merely reiterates that the agreement is *de facto* exclusive because its annual purchase commitments

9    apparently "exceeded" what Samsung needed to buy.  But that ignores the dispositive issue:

10   whether the "contract[] that w[as] induced"—here, the Strategic Agreement—"w[as] exclusive

11   rather than run-of-the-mill . . . , which inevitably . . . [excludes] alternative sellers from some

12   portion of the market, namely the portion consisting of what was bought."[3]  *Aerotec Int'l, Inc. v.*

13   *Honeywell Int'l, Inc*., 836 F.3d 1171, 1182 (9th Cir. 2016) (simplified).  "The 'de facto' exclusive

14   dealing theory does not provide [a plaintiff] an end run around the obligation to first show that

15   express or implied contractual terms in fact substantially foreclosed dealing with a competitor for

16   the same good or service."  *Id.*  The answer—by Samsung's own admissions—is no.

17           Samsung's allegations (at ¶ 75) that "[e]ven where competitive alternatives to Broadcom

18   components were available, it was (and remains) impossible to redesign a Samsung mobile device

19   to include non-Broadcom components and obtain the required regulatory approvals to sell the

20   redesigned device in less than six months" also do not move the needle.  They actually establish

21   that factors *other* than the Strategic Agreement hindered Samsung's ability to fully operationalize

22   its multi-sourcing strategy.  And as soon as Samsung could, it terminated the Strategic Agreement

23   and began sourcing components immediately from Qorvo and Qualcomm.  *Id.* ¶¶ 45, 54.

24           A similar dynamic existed in *FTC v. Qualcomm*, where the Ninth Circuit held that a supply

25   agreement between Apple and Qualcomm for CDMA modem chips was not unlawfully exclusive.

26   _____

27   [3] Contrary to Samsung's assertion, the Ninth Circuit has not even endorsed a *de facto* theory of
     exclusionary dealing.  *See Aerotec*, 836 F.3d at 1182 ("Although we have not explicitly recognized
28   a 'de facto' exclusive dealing theory like that recognized in the Third Circuit and Eleventh Circuit
     . . . we need not reach the issue here.").

969 F.3d at 1004–05.  There, "[d]uring the relevant time period . . . the only serious competition Qualcomm faced with respect to the Apple contracts was from Intel, a company from whom Apple had considered purchasing modem chips prior to signing the 2013 agreement with Qualcomm." *Id.* at 1004.  "Intel won Apple's business *the very next year*," and there was no indication "that the [agreement between Qualcomm and Apple] delayed Apple's transition to Intel by any more than one year."  *Id.*  The agreement accordingly "did not have the actual or practical effect of substantially foreclosing competition in the CDMA modem chip market." *Id.* at 1004–05.  As in *Qualcomm*, the admitted circumstances here regarding the independent impediments to Samsung's multi-sourcing strategy and Samsung's success in securing supply after the termination confirm that the Strategic Agreement did not foreclose competition.

Samsung's argument that the Strategic Agreement is not entitled to antitrust immunity because it was purportedly terminated due to regulatory pressure, Opp'n at 17–18, is another red herring.  Broadcom has never argued that the Strategic Agreement is immune from the antitrust laws.  Rather, Broadcom's argument is that Samsung cannot plead that the Strategic Agreement is unlawfully exclusive because, by being in effect for six months, it did not impact Samsung's ability to secure alternate supply or harm competition among component suppliers.  It is these elements that make the Strategic Agreement no different than contracts courts consistently conclude are not unlawfully exclusive.  *See* Mot. at 18, 20 (collecting authorities).  Regardless of why the parties terminated it, the Strategic Agreement admittedly had no effect on the "opportunities for other traders"—*i.e.*, Broadcom's competitors—"to enter into or remain in th[e] market."  *Qualcomm*, 969 F.3d at 1003.  That is fatal to Samsung's exclusive dealing claims.

## 2.  Samsung's Foreclosure Shares Rest on Improper Product Markets

Samsung cannot credibly deny that its alleged foreclosure shares are premised on implausible product markets gerrymandered around the "Critical Components" that Samsung contractually agreed to purchase.  Samsung disputes that its proposed product markets are improper single-brand markets, but it cannot run away from its allegations that (i) "Broadcom has been the sole merchant global supplier of phone standalone BT/Wi-Fi chips, affording it a 100% share of sales in the relevant Global Phone Standalone BT/Wi-Fi Chip Market," Compl. ¶ 43, and

1    (ii) "Broadcom has been the sole competitor in the Global Phone Standalone GNSS/GPS Chip

2    Market, affording it a 100% share of sales in the Global Phone Standalone GNSS/GPS Chip

3    Market," *id.* ¶ 47.  A relevant market defined around a product to give one brand 100% market

4    share is by definition a single-brand market.  *See Innovative Health LLC v. Biosense Webster, Inc.*,

5    19-cv-1984, 2022 WL 1599713, at *5 (C.D. Cal. Mar. 22, 2022) ("Each of the three catheter

6    markets that [plaintiff] purports to define includes only one product from one brand . . . . This is

7    precisely the definition of a single-brand market." (simplified)), *rev'd on other grounds*, No. 22-

8    55413, 2024 WL 62948 (9th Cir. Jan. 5, 2024).  Samsung has not pleaded the "rare and unforeseen

9    circumstances" to support single-brand markets defined around Broadcom's own components.

10    *Apple Inc. v. Psystar Corp.*, 586 F. Supp 2d 1190, 1198 (N.D. Cal. 2008).

11        Samsung also does not dispute that it improperly defines product markets co-extensively

12    with the "Critical Components" it committed to purchase under the Strategic Agreement.  A

13    properly defined relevant market must include all "sellers or producers who have actual or potential

14    ability to deprive each other of significant levels of business."  *Thurman Industries, Inc. v. Pay 'N

15    Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir. 1989).  In assessing foreclosure, a relevant market

16    must "include[] the full range of selling opportunities reasonably open to rivals, namely, all the

17    product and geographic sales they may readily compete for."  *Omega*, 127 F.3d at 1163

18    (simplified).  A plaintiff alleging exclusive dealing cannot short-circuit this requirement by

19    limiting the market to products covered by the challenged contract.  That is because "adopt[ing]

20    [the] position that contractual restraints render otherwise identical products non-interchangeable

21    for purposes of relevant market definition" would mean that "any exclusive dealing arrangement,

22    output or requirement contract, or franchise tying agreement would support a claim for violation

23    of antitrust laws."  *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 438 (3d Cir.

24    1997).  "[F]or this reason, no court has defined a relevant product market with reference to the

25    particular contractual restraints of the plaintiff."  *Id.*; *see also Forsyth v. Humana, Inc.*, 114 F.3d

26    1467, 1476 (9th Cir. 1997) (rejecting "attempt to limit the relevant market to acute care hospitals

27    used by [the defendant's] insureds," as their use of those hospitals was governed by "contractual

28    provisions in their . . . policies").  Samsung cannot do so here.

Samsung further contends that it "has defined the markets based on functionality and cross-elasticity of demand," Opp'n at 21, but the Complaint's allegations are conclusory and mostly parrot those legal terms, *see e.g.*, Compl. ¶¶ 31, 32, 35, 40. "[M]erely restat[ing] a commonly used test for market definition without providing any factual basis for the claim" is insufficient to plead a relevant market. *Psystar*, 586 F. Supp 2d at 1198. Samsung also cannot dispute that it is improperly isolating Phone Standalone BT/Wi-Fi chips, Phone Standalone GNSS/GPS chips, and OMH LPAMiD Modules into their own markets by excluding components that share similar functionality but are not customized for Samsung's smartphones. This cannot be squared with the fact that "[c]ourts have repeatedly rejected efforts to define markets by price variances or product quality variances." *In re Super Premium Ice Cream Distribution Antitrust Litig.*, 691 F. Supp. 1262, 1268 (N.D. Cal. 1988). Nor can it be squared with Samsung's contradictory admission that it was able to ship its Galaxy Note 20 smartphone with "Broadcom's older, less advanced BCM47755 [GNSS] chip." Compl. ¶ 72. And Samsung cannot distinguish *StreamCast Networks, Inc. v. Skype Technologies, S.A.*, 547 F. Supp. 2d 1086 (C.D. Cal. 2007). The plaintiff there sought to do exactly what Samsung tries here—define a relevant market around the "unique attributes and components" that made the defendant's product "more attractive and efficient"—a gambit that failed given the admitted existence of other products that "permit users to accomplish the same basic task." *Id.* at 1095. Samsung has not alleged foreclosure, given its gerrymandered markets around the BT/Wi-Fi and GNSS Chips and OMH LPAMiD modules it purchased from Broadcom. Those markets are implausible, "not natural, artificial," and "contorted to meet [Samsung's] litigation needs." *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1121 (9th Cir. 2018) (simplified).

### D.     Samsung Fails to Plead a Tying Agreement

1.     <u>The Strategic Agreement's Minimum Purchase Requirement Is Not an Unlawful Tying Arrangement, "De Facto" or Otherwise</u>

"The paradigmatic unlawful tying relationship exists where a seller expressly conditions the sale of the tying product on the buyer's additional purchase of the tied product." *Apple iPod iTunes Antitrust Litig.*, No. C 05-00037, 2009 WL 10678931, at *3 (N.D. Cal. May 15, 2009). Faced with a lack of any express tying conditions in the Strategic Agreement, Samsung insists that the lynchpin of a tying arrangement is "coercion," Opp'n at 22, and that the Strategic Agreement

1  had the *effect* of conditioning Broadcom's sale of BT/Wi-Fi and GNSS/GPS chips on Samsung's

2  purchase of OMH LPAMiD modules from Broadcom because "[p]aying twice for the same

3  component—paying Broadcom's competitor for the component and paying Broadcom under the

4  'take or pay'—was not economically viable." Compl. ¶¶ 8, 111, 122.

5  While courts have recognized *de facto* tying agreements, "[l]iability in such cases . . . is

6  limited where separate purchase of the allegedly tying and tied products is a 'reasonable

7  alternative' to buying the seller's packaged product." *Apple iPod iTunes Antitrust Litig.*, 2009 WL

8  10678931, at *3.  Samsung cites *Ways & Means, Inc. v. IVAC Corp.*, 506 F. Supp. 697, 701 (N.D.

9  Cal. 1979), for the proposition that a tying arrangement may exist where the "only viable economic

10 option is to purchase the tying and tied products in a single package."  Opp'n at 23.  That case only

11 supports dismissal here, as the plaintiffs failed to establish a tying arrangement because they could

12 and did purchase the allegedly tied product from alternate suppliers.  *See* 506 F. Supp. at 702.

13 Similarly, Samsung—by its own admissions—concedes that it at all times was able to negotiate

14 and secure alternate supply for its desired components.

15 Samsung's tying claims also fail because ███████████████████████████████████

16 ███████████████████████████████████.  In *Centennial Sch. Dist. v.*

17 *Indep. Blue Cross*, No. Civ. A. 93-3456, 1994 WL 62016, at *5 (E.D. Pa. Feb. 28, 1994), a

18 minimum purchase agreement that required the plaintiff to buy an unwanted health insurance plan

19 was challenged as an unlawful tying arrangement.  The court dismissed the claim on the pleadings

20 as "[t]he minimum purchase requirement may be satisfied in any way: by the purchase of [the

21 tying product] alone, by the purchase of [the tied product] alone, or by any combination of the

22 two."  *Id.*  Because "the minimum participation agreement [did] not require purchase of the [tied

23 product]," there was no unlawful tie.  *Id.*  So too here.

24 Samsung's reliance on *Datagate, Inc. v. Hewlett-Packard Co.*, 60 F.3d 1421 (9th Cir.

25 1995), is also unavailing.  There, the defendant would not provide software service if its customer

26 purchased hardware from a third party, and the customer "could not afford to do without

27 [defendant's] software maintenance."  *Id.* at 1426.  Because the "[defendant's] threat to withhold

28 software service precluded [the customer] from considering other providers of hardware service,"

there was a triable issue as to whether this was a coercive tying arrangement. *Id.* By contrast, the Strategic Agreement did not condition sales of any products upon Samsung's purchase of another.

2. Samsung's Tying Claims Fail Because It Has Not Alleged a Cognizable Tying Product Market or Market Power

Samsung's tying claims also falter because it fails to allege a cognizable tying product market and thus the requisite market power. *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1159 (9th Cir. 2003). As explained above (at Section II.C.), Samsung cannot artificially narrow markets defined by the constraints it agreed to by contract. The Third Circuit's *Queen City Pizza* decision explains why Samsung's approach is flawed. There, franchisees argued that Domino's requirement that franchisees only use Domino's-approved pizza ingredients was an unlawful tying arrangement. 124 F.3d at 442. The Third Circuit rejected the attempt to plead a relevant tying market consisting of only Domino's-approved products covered by the franchise agreement, because the "contractual restraints assumed by a plaintiff are not sufficient by themselves to render interchangeable commodities non-interchangeable for purposes of relevant market definition." *Id.* at 443. When "the defendant's 'power' to 'force' plaintiffs to purchase the alleged tying product stems not from the market, but from plaintiffs' contractual agreement to purchase the tying product, no claim will lie." *Id.* Those are precisely Samsung's allegations here: Samsung's "Phone Standalone BT/Wi-Fi Chip Market" and "GNSS/GPS Chip Market" are based in artificial restraints created by the Strategic Agreement itself.

E. **Samsung's Monopolization and California Cartwright Act Claims Fail**

The failure to allege exclusive dealing or tying necessitates dismissal of Samsung's monopolization claims. *See PNY*, 2014 WL 2014 WL 1677521, at *8–9. Even if the Sections 1 and 2 analyses are divorced, Samsung fails to plead that Broadcom had monopoly power as other suppliers existed for Samsung to source components. *See* Section II.C. And, Samsung's failure to plead federal exclusive dealing and tying claims requires dismissal of its Cartwright Act claims. *Cty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001).

III. **CONCLUSION**

The Court should dismiss Samsung's Complaint with prejudice.

1    Dated:  November 1, 2024                LATHAM & WATKINS LLP

2

3                                           By:   */s/ Christopher S. Yates*
                                                  Christopher S. Yates

4
                                            Christopher S. Yates (Cal. Bar No. 161273)
5                                            *chris.yates@lw.com*
                                            Belinda S Lee (Cal. Bar No. 199635)
6                                            *belinda.lee@lw.com*
                                            Aaron T. Chiu (Cal. Bar No. 287788)
7                                            *aaron.chiu@lw.com*
                                            505 Montgomery Street, Suite 2000
8                                            San Francisco, California 94111
                                            Telephone: +1.415.391.0600
9
                                            Sean M. Berkowitz (*pro hac vice*)
10                                           *sean.berkowitz@lw.com*
                                            330 North Wabash Avenue, Suite 2800
11                                           Chicago, Illinois 60611
                                            Telephone: +1.312.876.7700
12
                                            *Attorneys for Defendants Broadcom Inc.,*
13                                           *Broadcom Corporation and Avago Technologies*
                                            *International Sales Pte. Limited*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28